Argued February 2, reversed April 13, 1955

# STATE OF OREGON *v.* WOJAHN
282 P. 2d 675

*James J. Kennedy,* Deputy District Attorney, Portland, argued the cause for appellant. With him on the brief were John B. McCourt, District Attorney, Portland, and Robert Y. Thornton, Attorney General, Salem.

*Howard K. Beebe,* Portland, argued the cause for respondent. On the brief were Maguire, Shields, Morrison & Bailey, Portland.

ROSSMAN, J.

This is an appeal by the state from a judgment of the circuit court which was entered in favor of the defendant after the court had sustained a demurrer to the indictment upon the ground that the indictment did not charge the commission of a crime.

The indictment is based upon Oregon's negligent homicide statute, ORS 163.090. The latter was amended, after the indictment was filed, by Oregon Laws 1953, ch 676, § 2. The material part of ORS 163.090 follows:

> "When the death of any person ensues within one year as the proximate result of injuries caused by the driving of any motor vehicle in a negligent manner, * * * the person so driving such vehicle * * * is guilty of negligent homicide, and, upon conviction, shall be punished by imprisonment in the county jail for not more than one year, or in the state penitentiary for not more than three years, or by a fine of not to exceed $2,500, or by both fine and imprisonment."

ORS 161.010 says:

> "As used in the statutes relating to crimes and criminal procedure, unless the context requires otherwise:
> * * * * *

"(2) 'Neglect,' 'negligence,' 'negligent' and 'negligently' import a want of such attention to the nature or probable consequences of the act or omission referred to as a prudent man ordinarily bestows in acting in his own concerns."

The indictment charges that the defendant, on July 7, 1953, "negligently operated a motor vehicle upon Northeast Broadway Street in the City of Portland," and gives the following particulars:

"* * * failing to obey a traffic signal, and without due regard to the traffic, surface and width of the highway, and the hazard and other conditions then and there existing; and with want of such attention to the nature and probable consequences of his acts or omissions as a prudent person ordinarily bestows in acting in his own concerns."

The indictment avers that the defendant, while operating his car in the above manner, injured one Thomas Howell, who on the same day died "as a proximate result" of the defendant's negligence.

The defendant-respondent does not claim that the indictment fails to charge him with negligence. His challenge of the indictment is in fact a challenge of ORS 163.090. The defendant's brief makes these charges against the act (which was Oregon Laws 1941, ch 439, § 3):

"(a) A conviction thereunder would deprive this respondent of his liberty without due process of law in violation of the Fourteenth Amendment to the Constitution of The United States;

"(b) Said statute is so vague and indefinite that respondent's right to demand the nature and cause of the accusation against him is denied and impaired and, therefore, violates Article I, Section 11, Oregon Constitution;

"(c) Because of its vagueness and uncertainty the statute casts upon the judges and juries of the judicial department the duty to ascertain and fix

a standard of conduct, ex post facto, the breach of which constitutes a crime, and, therefore, violates Article I, Section 1, and Article III, Section 1, Oregon Constitution;

"(d) Because of its vagueness the statute which provides for the punishment of crime cannot be founded upon the principles of reformation, but must necessarily be founded upon vindictive justice and, therefore, violates Article I, Section 15, Oregon Constitution."

The issues presented by those contentions are not unprecedented. Many states have legislation comparable to ours, and their acts have been the subject of judicial attention. Although our negligent homicide act controlled the outcome in *State v. Smith,* 198 Or 31, 255 P2d 1076, and *State v. Coffman,* 171 Or 166, 136 P2d 687, no one questioned its adherence to constitutional requirements.

Before turning to the decisions of the other jurisdictions which determined the validity of comparable legislation we will take note of the fact that penal statutes, which authorize a determination of an accused's guilt or innocence by applying to his challenged act a criterion of due care, are not strangers to this jurisdiction. One act of that kind is our involuntary manslaughter act, ORS 163.040, subsection 2; another is our act which governs the speed of motor vehicles, ORS 483.102.

ORS 163.040, subsection 2, says:

"Any person who, in the commission of any unlawful act, or a lawful act without due caution or circumspection, involuntarily kills another, is guilty of manslaughter. The provisions of this subsection shall not apply to the killing of any person where the proximate cause of such killing is an act or omission defined as negligent homicide in ORS 163.090."

The penalty for manslaughter is "imprisonment in the penitentiary for not more than 15 years and by a fine not exceeding $5,000." ORS 163.080. The first sentence of ORS 163.040, subsection 2, in substantially its present language, became a part of our laws in 1864.

It will be observed that the above section of our manslaughter act authorizes a finding that the accused is guilty if the fatal lawful act was committed "without due caution or circumspection." We have noticed that the negligent homicide act renders the accused guilty if he drove "in a negligent manner" and thereby inflicted an injury, as a proximate result of which the victim died within one year.

According to a note in 31 California Law Review 215, negligent homicide acts have been enacted "because of the difficulty of getting manslaughter convictions in automobile death cases." Since the criteria employed by the two acts as the means of determining guilt are virtually alike, the jury's reluctance to convict of manslaughter and its response to duty under the negligent homicide act must come from something other than the criteria which determine guilt.

Giving attention only to the phraseology in which the two measures are cast, we observe that the differences between manslaughter and negligent homicide are (a) the title for the new crime is less grisly in its connotation than that of the old; (b) a lesser penalty is prescribed for negligent homicide than for manslaughter; (c) the test for negligent homicide is "in a negligent manner", whereas manslaughter takes as its test "due caution or circumspection"; (d) the manslaughter act prescribes no period within which death must ensue, but the negligent homicide act fixes as the period one year.

■ In its administration of the manslaughter act, this court has regarded the term "without due caution or

circumspection'' as the virtual equivalent of the term "negligence". For example, *State v. Miller,* 119 Or 409, 243 P 72 (affirmed per curiam 273 US 657, 47 S Ct 344, 71 L Ed 825; and see the comment in *Cline v. Frink Dairy Co.,* 274 US 445, 464, 47 S Ct 681, 71 L Ed 1146, upon *State v. Miller*) said:

"If the defendant had been indicted for having committed the crime of involuntary manslaughter by the doing of a lawful act 'without due caution or circumspection,' it would have been necessary under that theory to have alleged specifically the facts constituting such negligence. The rule in alleging negligence in civil actions would then apply."

See, also, *State v. Boag,* 154 Or 354, 59 P2d 396; *State v. Newberg,* 129 Or 564, 278 P 568; and *State v. Clark,* 99 Or 629, 196 P 360.

The above section of the manslaughter act has been enforced many times, yet no one has ever called upon the act to sustain its validity. *State v. Boag,* supra; *State v. Lockwood,* 126 Or 118, 268 P 1016; *State v. Trent,* 122 Or 444, 252 P 975, 259 P 893; *State v. Newberg,* supra; *State v. Miller,* supra; *State v. Clark,* supra; *State v. Justus,* 11 Or 178. Its validity has been taken for granted.

The above indicates that ever since its enactment in 1864 the precursor of the negligent homicide statute has been treated as constitutional. Seemingly, no doubt has ever been entertained upon that score. We also see from the foregoing that the formula of "due caution or circumspection", which the manslaughter act employs as the test of an accused's conduct, has been treated as correlative of "negligence", and that no difficulty has been experienced in drafting indictments under the act, or with any other phase of the act's administration.

ORS 483.102, which we mentioned in the preceding paragraph, follows:

"(1) No person shall drive a vehicle upon a highway at a speed greater than is reasonable and prudent, having due regard to the traffic, surface and width of the highway, the hazard at intersections and any other conditions then existing.

"(2) No person shall drive at a speed which is greater than will permit the driver to exercise proper control of the vehicle and to decrease speed or to stop as may be necessary to avoid colliding with any person, vehicle or other conveyance on or entering the highway in compliance with legal requirements and with the duty of drivers and other persons using the highway to exercise due care."

ORS 483.990, subsection (2), says:

"Any violation of ORS 483.102, unless such violation occurs under the conditions of subsection (3) of this section, is punishable, upon conviction, by a fine of not more than $25, or by imprisonment for not more than five days, or both."

Subsection (3) of ORS 483.102 authorizes the imposition of a penalty somewhat greater than the one prescribed in subsection (2) if the defendant, in addition to violating the basic rule, violated other regulations which pertain to speed.

*Rauw v. Huling,* 199 Or 48, 259 P2d 99, declares:

"* * * Speed of motor vehicles is regulated entirely by the provisions of the basic rule. 'Designated speeds' for certain districts are not 'speed limits'. The statute that provides for certain 'designated speeds' merely sets forth a rule of evidence. When the question of speed of a motor vehicle is involved, the ultimate fact to be determined is whether the basic rule has been violated, not whether the vehicle traveled in excess of the designated speed."

In *State v. Anthony,* 179 Or 282, 169 P2d 587, the court said:

"* * * The criminal provisions of the 'basic rule' in the Oregon Motor Vehicle Code have been enforced regardless of the fact that the test of criminality is the failure to use due care."

See, also, *State v. Lockwood,* supra.

If the defendant's contention is correct, that criminal statutes which determine the lawfulness of an accused's conduct by the application of a test, such as reasonable speed, are vague and therefore unconstitutional, then *Rauw v. Huling,* supra, in holding that the basic rule of ORS 483.102 is the ultimate test and that the designated speeds are nothing more than "a rule of evidence", had the startling effect of rendering a major feature of our traffic laws unconstitutional.

Although this court has many times applied the provisions of our traffic laws which contain the basic rule, it has never manifested any misgiving concerning the validity of the statute. See, for example, in addition to *Rauw v. Huling,* supra, *Prauss v. Adamski,* 195 Or 1, 244 P2d 598, *Morris v. Fitzwater,* 187 Or 191, 210 P2d 104.

In *State v. Magaha,* 182 Md 122, 32 A2d 477, the court said:

"We adopt the rule supported by the great weight of authority in the United States that a statute prohibiting under penalty the driving of a motor vehicle on a public highway at a speed greater than is reasonable and proper, or so as to endanger life, limb or property is not void for indefiniteness."

The validity of speed regulations such as ours is generally recognized. *Gallagher v. State,* 193 Ind 629, 141 NE 347, 29 ALR 1059; 8 Blashfield, Cyclopedia of Auto-

mobile Law and Practice, §§ 5308, 5309, 5310; Huddy, Cyclopedia of Automobile Law, § 92.

The foregoing shows that this court, through a succession of decisions, has deemed constitutional (1) ORS 163.040, which selects as the test of guilt "without due caution or circumspection", and (2) ORS 483.102, which includes this phrase, "reasonable and prudent, having due regard to the traffic, surface and width of the highway, the hazard at intersections and any other conditions then existing."

We shall now turn to the decisions of other jurisdictions which determined the validity of negligent homicide statutes. Legislation, substantially similar to ours, enacted in other states has been assailed with contentions similar to those set forth in the language which we quoted from the defendant's brief.

The pioneer negligent homicide statute was adopted in 1921 by the State of Michigan. It provided:

"Every person who, by the operation of any vehicle at an immoderate rate of speed or in a careless, reckless or negligent manner, but not wilfully or wantonly, shall cause the death of another, shall be guilty of the crime of negligent homicide and upon conviction shall be sentenced to pay a fine not exceeding one thousand dollars, or to undergo imprisonment in the State Prison for a period not exceeding five years, or by both such fine and imprisonment in the discretion of the court."

*People v. McMurchy,* 249 Mich 147, 228 NW 723, sustained the validity of the part of the Michigan statute above quoted and in so doing held adversely to virtually every contention which the respondent in the case at bar submits. The sole exception is the respondent's fourth contention. *People v. McMurchy* is entitled to more than ordinary weight because it was preceded by two earlier cases which, as is evident from the

following quotations taken from it, required the court to construe the Michigan statute and determine its validity:

"The provisions of this act were considered by this court in the case of *People v. Campbell*, 237 Mich. 424, 212 N. W. 97. It was held that the offense that this statute defines is homicide caused by a more than slight and less than gross negligence.

"This act was again under consideration by this court in the case of People v. Maki, 245 Mich. 455, 223 N. W. 70. * * * In the Maki Case the validity of the act was also questioned. The decision of the lower court upholding the constitutionality of the act was affirmed, but only by an evenly divided court."

It will be noticed from the excerpt which we quoted from the McMurchy decision that the court divided evenly in *People v. Maki* upon the validity of the act. The decision in the Maki case, which proposed to hold the act invalid, was written by Justice Potter. The latter's opinion became the keynote of the brief submitted by the respondent in the case at bar. Yet one year and ten days after Justice Potter penned his opinion and the court had divided equally, all, including Justice Potter, united in holding the act constitutional. The occasion was *People v. McMurchy*. In the latter, the principal opinion was written by Justice Butzel. Justice McDonald, who had concurred in the opinion which Justice Potter filed in *People v. Maki*, concurred in the result of the McMurchy case. Justice Fead, who, also, had concurred in Justice Potter's opinion, wrote a specially concurring opinion, in which he declared:

"I concur on the further ground that the constitutionality of the act was settled in People v. Maki, 245 Mich. 455, 223 N. W. 70, although the court was there equally divided, as fully as though

it had been so held by a majority of the justices,
* * * ."

Justice Potter concurred with Justice Fead and, therefore, with Justice Butzel. Thus all eight members of the court agreed upon the validity of the act. A decision which was preceded by the extensive analysis which is reflected by *People v. McMurchy* is entitled to more than ordinary weight.

Let us now take note of the specific holding in the McMurchy decision. The Michigan statute contained the following provision, which is absent from ours:

"In any prosecution under this act, whether the defendant was driving at an immoderate rate of speed shall be a question of fact for the jury."

The McMurchy decision deemed that provision invalid as an effort to divest the courts of their judicial power. All other parts of the act were upheld. Under the court's construction, the Michigan act accepted as the test for determining guilt the standard of due care. It said:

"The commonly accepted definition of 'immoderate' is: *'Not within reasonable limits.'* If one drives at a rate of speed that is not reasonable, he is driving at an immoderate rate of speed and not within reasonable limits. If under those circumstances he kills a person, he is guilty of negligence. The term 'immoderate speed' constitutes a form of negligence and may result in damage to person or property. If it causes death, it is negligent homicide."

Continuing, it declared:

"It is further claimed that a person charged with negligent homicide would not know how to plead, and that a judge would not know whether to accept a plea of guilty or not. This is captious argument. The accused would know whether he had killed. He should know whether he had been driv-

ing at an immoderate rate of speed or in a careless, reckless, or negligent manner. If he did not know, he would stand mute. He would not be apt to plead guilty without stating the circumstances to the judge, who would tell him how to plead.

\* \* \* \* \*

"The law is well settled that the Legislature in the exercise of its police power, in order to preserve the health, morals, and safety, may constitute something to be a crime that theretofore was not criminal. It may impose a criminal responsibility for a tort that theretofore only carried with it civil liability."

As will be recalled, the respondent in the instant case argues that our act is vague and indefinite. He claims that since it does not require mens rea, a motorist as he proceeds along the highway can never know when he is subjecting himself to criminal liability. Justice Butzel gave attention to a similar contention. In answering it he quoted in part from Justice Cooley in *People v. W. Roby,* 52 Mich 577, 579, 18 NW 365, 366, 50 Am Rep 270, as follows:

"I agree that as a rule there can be no crime without a criminal intent, but this is not by any means a universal rule. One may be guilty of the high crime of manslaughter when his only fault is *gross negligence,* and there are many other cases where mere neglect may be highly criminal. Many statutes which are in the nature of police regulations, as this is, impose criminal penalties irrespective of any intent to violate them, the purpose being to require a degree of diligence for the protection of the public which shall render violation impossible."

Presently Justice Butzel took note of the insuperable difficulty which a draftsman of a penal traffic act would encounter if he attempted to prohibit negligent

driving without employing the terms of civil negligence. Then he said:

"The very same evidentiary facts required to prove civil liability for negligence may be used to prove criminal liability. It is true that there may be certain defenses as contributory negligence, etc., which would discharge one from civil liability but not from criminal liability. The main constitutional objections made by respondent as to the act under consideration could be made to the rules establishing civil liability on account of negligence. It is just as much a violation of the due process clause of the Constitution to take property as it is to take the liberty of a person. The due process clause refers to civil as well as criminal liability, to the taking of property as well as liberty. If these objections are valid, then the jury exercises as much legislative power to determine civil liability as it does in determining criminal liabilty. The law governing civil liability for negligence is unquestioned. * * *

"An examination of the automobile speed laws of the forty-eight states discloses that, in nine, statutes defining manslaughter include death caused by lack of 'due caution and circumspection.' Eleven states include, under the crime of manslaughter, death caused by 'culpable negligence.' In fifteen states, including some above referred to, manslaughter is defined as 'killing a person without malice, etc., while doing an unlawful act,' and it is further provided that driving 'at a rate of speed that is not reasonable and proper,' or words to that effect, shall be unlawful. In one state, the statute provides that manslaughter shall consist of the killing of a person by 'one engaged in perpetration of any crime or misdemeanor not amounting to a felony,' instead of referring to an unlawful act. In forty-seven states of the Union and in the District of Columbia and Hawaii there are statutes which forbid driving 'at a rate of speed greater than is reasonable and proper, having regard for the width, traffic and use of the highway and in a manner so as

to endanger property or the limb of any person.' In some of the states the words 'careful and prudent' are used. In others, words with a like meaning to those quoted are used."

At that point Judge Butzel reviewed decisions in which it was claimed that the standard set by the statute under attack was so vague that the statute violated the due process clause. At the conclusion of his review, he said:

"It will be found upon examination of all the cases referred to and from which quotations were given, with the exception of Commonwealth v. Pentz, supra, that there were involved questions of rates, prices, or words of such indefinite meaning that no legal definition could be found for them either in the statutes, common law, or the general understanding of the public. On the other hand, a statute imposing liability for negligence in driving an automobile at an immoderate rate of speed or in a manner so as to constitute negligence, has been uniformly upheld by our courts, except in a very few instances.

"The law of negligence has become part of the law of the land. It is distinctly understood. A statute analogous to the one under consideration has been on the United States statute books since the year 1838. It has been but slightly amended. It is entitled: 'An Act to provide for the better security of * * * passengers on board of vessels propelled in whole or in part by steam.' 5 Stat. at Large, pp. 304, 306, § 12."

The California legislature and the courts of that state have repeatedly given attention to negligent homicide legislation. In 1935 California enacted § 500, Vehicle Code of California (St. 1935, p. 173), which provided:

"When the death of any person ensues within one year as the proximate result of injuries caused by the driving of any vehicle in a negligent manner

or in the commission of an unlawful act not amounting to felony, the person so operating such vehicle shall be guilty of negligent homicide, * * *."

Apart from its second alternative, the act is substantially the same as ours. *People v. Pryor,* 17 Cal App2d 147, 61 P2d 773, in upholding the constitutionality of the act, placed this construction upon it:

"* * * The offense of negligent homicide defined by section 500 of the Vehicle Code (St. 1935, p. 173,) does not depend on the presence of the element of willfulness or intention to violate the law. The offense may be complete without any such purpose or intent."

*People v. Pociask,* 14 Cal2d 679, 96 P2d 788, was, likewise, an appeal by a motorist from a conviction under the California act. The appellant contended that the trial judge erred when he refused to charge the jury that the defendant's driving could not warrant a finding of negligence unless it amounted to "a flagrant and reckless disregard of the safety of others and a wilful indifference to possible injuries, or consist of the doing of a lawful act in a culpably reckless manner." As support for that contention, he depended in part upon § 20 of the California penal code, which provided: "In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence." In charging the jury, the trial judge read § 7 of the penal code, which contained the following:

"The words 'neglect,' 'negligence,' 'negligent,' and 'negligently' import a want of such attention to the nature or probable consequences of the act or omission as a prudent man ordinarily bestows in acting in his own concerns."

In sustaining the conviction, the court reasoned:

"* * * True, in every crime there must exist the union of act and intent or criminal negligence. But,

in answering the question of what constitutes criminal negligence, the court is bound to apply an appropriate definition enacted by the legislature. Only when the legislature has not properly defined a term is it necessary for the courts to look to the meaning thereof as understood in the common law. 8 R.C.L., p. 60. Section 500 of the Vehicle Code makes criminal, that is, punishable (volume 2, Words and Phrases, First Series, Criminal, page 1741), the negligent driving of a motor vehicle which causes injuries to another proximately resulting in death within the time specified in the section. This court has consistently refused to add to the words of pertinent statutes any formulae clearly not included within the plain language thereof.

\* \* \* \* \*

"It is within the function of the legislature to make laws defining what breaches of the public peace shall be made punishable. Accordingly it may specify various degrees of the same crime and require a different measure of punishment for each. It is apparent that by the enactment of section 500 of the Vehicle Code the legislature has specified a lesser degree of punishment when the homicide is committed in the doing of an unlawful act not amounting to a felony while operating any vehicle, or while driving in a negligent manner, than is meted out in the cases of homicides otherwise committed in the doing of an unlawful act not amounting to felony or without due caution and circumspection. \* \* \* That is, in order to foster greater care in the operation of such dangerous instrumentalities, the legislature may have afforded a means by which appropriate punishment may be imposed upon all who have caused death through a breach of duty of due care in such operation."

In 1941 California amended its negligent homicide act by substituting for the phrase "in a negligent manner", as it appeared in the 1935 act, this expression, "with reckless disregard of, or wilful indifference to, the safety of others." Stat. 1941, ch 279, § 1. The

amendment was construed in *People v. Young,* 20 Cal 2d 832, 129 P2d 353; *People v. Montes,* 56 Cal App2d 30, 131 P2d 581; and *People v. Murray,* 58 Cal App2d 239, 136 P2d 389. In the Young decision, the court said:

> "There can be no doubt that the legislature intended that something more than ordinary negligence was to be required by the 1941 amendment. The words deleted and those substituted in their place clearly have a different meaning. We believe this is clear even though it is noted that the 1941 amendment still refers to the crime as 'negligent homicide.'"

California Statutes 1943, chapter 421, section 1, repealed the negligent homicide act. In 1945 the state again enacted legislation upon the subject of death caused through the operation of motor vehicles, but, in the meantime, the prosecution of death-dealing drivers was under the state's manslaughter act. *People v. Ely,* 71 Cal App2d 729, 163 P2d 453. Statutes 1945, chapter 1006, provided as follows:

> "Manslaughter is the unlawful killing of a human being without malice. It is of three kinds:
>
> \* \* \* \* \*
>
> "3. In the driving of a vehicle—
>
> "(a) In the commission of an unlawful act, not amounting to felony, with gross negligence; or in the commission of a lawful act which might produce death, in an unlawful manner, and with gross negligence.
>
> "(b) In the commission of an unlawful act, not amounting to felony, without gross negligence; or in the commission of a lawful act which might produce death, in an unlawful manner, but without gross negligence.
>
> "This section shall not be construed as making any homicide in the driving of a vehicle punishable which is not a proximate result of the commission of

an unlawful act, not amounting to felony, or of the commission of a lawful act which might produce death, in an unlawful manner."

*People v. Wilson,* 78 Cal App2d 108, 177 P2d 567, held that a conviction was authorized under subdivision (b) even though the accused was guilty of only ordinary negligence. The decision reasoned that negligent driving was unlawful and that, likewise, an infraction of the state's traffic laws rendered the driving unlawful within the purview of subdivision (b). The court ruled that neither wilfulness nor wantonness were essential elements of the crime defined in the 1945 act. We take the following from the decision:

"It is contended that subdivision (b) is void for uncertainty, in that a defendant charged thereunder would not be apprised of the particular acts of which he was accused. We find no uncertainty in the section. The terms 'lawful' and 'unlawful' are well understood in law. Defendant says in her brief that an act, to be unlawful, need not be punishable as a crime, and she cites authorities to support her statement. It is a correct statement. An act which is expressly forbidden by law is an unlawful act and an act committed in a manner forbidden by law is committed in an unlawful manner."

The charge to the jury explained the principles of ordinary negligence. The defendant's conviction was affirmed. To life effect are *People v. Mead,* 126 Cal App2d 164, 271 P2d 619; *People v. Flores,* 83 Cal App2d 11, 187 P2d 910; *People v. Lett,* 77 Cal App2d 917, 177 P2d 47; and *People v. Barnett,* 77 Cal App2d 299, 175 P2d 237.

We see from the foregoing that under the California act of 1945 a motorist whose driving causes a death may be convicted of manslaughter if the operation of his car was unlawful or if the car was operated in an unlawful manner. Ordinary negligence, or a violation of traffic regulations suffices to establish

that the operation of the car constituted "an unlawful act" and likewise that the vehicle was operated "in an unlawful manner."

A recent decision which maintained the validity of another negligent homicide statute is *State v. Ashton,* 175 Kan 164, 262 P2d 123. The Kansas statute follows:

"When the death of any person ensues within one year as a proximate result of injury received by the driving of any vehicle in negligent disregard of the safety of others, the person so operating such vehicle shall be guilty of negligent homicide.

The appealing defendant contended that the act violated a provision of the Kansas bill of rights, which reads:

"In all prosecutions, the accused shall be allowed to appear and  *  *  *  demand the nature and cause of the accusation against him;  *  *  *."

He also contended that the statute violated the due process clause of the Constitution of the United States. In construing the statute, the court reasoned:

"It is clear the legislature did not attempt to specify in detail the innumerable and variable circumstances, conditions, acts and omissions from which death might result from vehicular traffic. It undertook to enact a statute sufficiently broad to encompass negligent acts and omissions of all kinds and character from which death ensued when committed in disregard of the safety of others."

It said:

"Surely we need not debate whether the term 'negligent' has a well defined meaning in legal parlance or in the mind of the average citizen. It is equally true the word 'disregard' has no hidden meaning."

The court disposed of the defendant's contentions in this way:

"Manifestly, no legislature could accurately anticipate every possible circumstance or contingency

which might arise and legislate specifically concerning it. That would be true concerning speed and all other factors which might become involved in highly dissimilar situations.   *   *   *

"Some offenses admit a much greater precision and definiteness than others and where possible statutes always should be framed with reasonable certainty. Reasonable and not mathematical certainty is what the law requires. It appears the instant statute is about as definite and certain as the subject matter, the evil sought to be remedied, permits.   *   *   *

"That traffic statutes based on general provisions prohibiting negligent, careless, reckless or wilful and wanton conduct in disregard of the safety of others do not contravene the constitutional guarantee of due process or the tenth section of our Bill of Rights by reason of indefiniteness or uncertainty is established by the overwhelming weight of authority."

The following is taken from *State v. Schaeffer,* 96 Ohio St 215, 117 NE 220:

"The Legislature, however, in this instance, saw fit to fix no definite rate of speed for the car, except to require that the car should not be operated at a speed 'greater than is reasonable or proper, having regard for width, traffic, use and the general and usual rules of such road or highway, or so as to endanger the property, life or limb of any person.' In short, the Legislature wrote into the statute what has become known as the 'rule of reason' ever since the Standard Oil Case (221 U.S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. [N.S.] 834, Ann. Cas. 1912D, 734) and Tobacco Trust Case (221 U. S. 107, 31 Sup. Ct. 632, 55 L. Ed. 663) were decided by the Supreme Court of the United States. In those cases the Supreme Court of the United States read into the statute the so-called 'rule of reason,' holding that the Anti-Trust Act really was not a denial of all restraint of trade. It would hardly be suggested that the Supreme Court of the

United States read into the statute something that made the statute unconstitutional, or read into the statute something that made it so indefinite and uncertain that it was incapable of advising the public as to what was or was not an offense under it, or that made the statute practically unenforceable. And yet, by parity of reason, it is claimed in this case that the Legislature, which wrote into the statute the same 'rule of reason,' thereby in effect nullified such statute, because of the indefiniteness and uncertainty of its terms. The contention is not sound.

''The suggestion that juries on the same state of facts may hold one way in one county, and another way in another county, indeed, that in the same county, upon the same state of facts, one jury may hold one way and another hold another way, is no argument against this contention. That is inevitable under any system of jurisprudence on any set of facts involved in a criminal transaction. Courts differ in their judgment; juries differ in their judgment; but that is no reason for the abolition of either, or for denying them jurisdiction sufficent to enforce the administration of statutes like the one in question. In our whole criminal procedure, even in capital and the most atrocious cases, where a man's life and liberty for life are involved, it is made the special province and duty of juries to determine what is 'reasonable,' and whether or not there is a 'reasonable' doubt of the defendant's guilt. Of course, that is a conclusion—almost incapable of precise and specific definition. What one jury might hold to be reasonable doubt, another jury would hold to the contrary; and still there is no way other than to leave the question to the jury to determine what is and what is not a 'reasonable doubt.'

''Again, one of the most common defenses interposed in prosecutions for murder is that of self-defense. It is the settled law of this state, as in most others, that if the defendant at the time of the killing bona fide believed himself to be in danger, whether he was or not, and had 'reasonable' grounds

for so believing, and used force pursuant to such situation, it is excusable homicide; and yet it is for the jury to put themselves in the situation of the parties, particularly that of the defendant, and determine from the evidence as to whether or not the defendant had 'reasonable' grounds. And so it is throughout our entire criminal jurisprudence.''

*United States v. Henderson,* 121 F2d 75, upheld as valid the negligent homicide act of the District of Columbia, which provided:

"Any person who, by the operation of any vehicle at an immoderate rate of speed or in a careless, reckless, or negligent manner, but not willfully or wantonly, shall cause the death of another, shall be guilty  *  *  *.''

The lower court sustained the defendant's motion to quash the information. Upon appeal, the defendant (respondent) contended that the act was uncertain and indefinite and, therefore, unconstitutional. The decision resolved the contention against the defendant and supported its conclusion with a wealth of authority. We take the following from the decision:

"The mere fact that the specified standard of liability may be one of varying degree does not make a criminal law unconstitutional. Many of the most familiar terms of the law are of this character. Practically all the common-law definitions of crime contain such words and phrases; as, for example, malice aforethought, deliberation and premeditation, consent, specific intent, breaking and entering, taking and carrying away, from the person or in the presence, and false testimony material to the issue.

"As the Supreme Court said in Nash v. United States: '*  *  * the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree.'

"The words and phrases used in the presently applicable statute, i.e., *immoderate* rate of speed,

*careless, reckless, negligent, manner, willfully, wantonly,* and *cause,* are all well known, both in common speech and in the terminology of the law. They have been used in other jurisdictions to define similar offenses and have been approved by the courts as appropriate and sufficient for that purpose. We conclude, therefore, that they are sufficient to bring the statute within the requirements of constitutionality,  *  *  *.''

The decision in *Commonwealth v. Pentz,* 247 Mass 500, 143 NE 322, written by Chief Justice Rugg, sustained a Massachusetts act which declared: ''*  *  * whoever upon any way operates a motor vehicle * * * so that the lives or safety of the public might be endangered'' is subject to punishment. The defendant, who had been adjudged guilty of a violation of that act, argued that the latter trenched upon the Fourteenth Amendment and provisions of the Massachusetts constitution which (1) require all crimes to be ''fully and plainly, substantially and formally described to him'' (the accused), and (2) guarantee the accused ''the judgment of his peers, or the law of the land.'' The decision said:

''*  *  * To endanger the lives and safety of the public by the operation of an automobile on a public way is not an intangible and shadowy act. It has specific relation to possible contact with human beings.''

The decision also said:

''We are of opinion that the statute is not contrary to any guaranty of the Fourteenth Amendment to the federal Constitution.

*  *  *  *  *

''The statute according to its plain words makes the act of operating a motor vehicle on a way 'so that the lives or safety of the public might be endangered' a criminal offense. It is that act which is penalized. The intent with which the act is done

is an immaterial factor. It is irrelevant whether the act is negligent, or not. Although it may be difficult to conceive of the operation of a motor vehicle on a way so as to endanger the lives or safety of the public which does not at the same time involve some element of negligence, nevertheless, the statute says nothing about negligence. Therefore, the question of negligence is foreign to the issues raised under the indictment. The only fact to be determined is whether the defendant did the prohibited act. This belongs to the class of statutes, of which there are many instances, where the General Court, legislating for the common welfare, has put the burden upon the individual of ascertaining at his peril whether his conduct is within the sweep of a criminal prohibition. The performance of the specific act constitutes the crime. The moral turpitude or purity of the notice by which it was prompted, and the knowledge or ignorance of its criminal character, are immaterial on the question of guilt."

*State v. Magaha*, 182 Md 122, 32 A2d 477, sustained the validity of an ordinance of the city of Baltimore, which provided:

"*  *  * Nothing contained herein or omitted herefrom shall be construed or held to relieve any person using, or traveling or being upon any street, for any purpose whatever, from exercising all reasonable care to avoid or prevent injury through collision with all other persons and vehicles."

The court said:

"*  *  * But it is well settled that a penal statute or ordinance should not be held void merely because juries may differ in their judgments in cases brought thereunder on the same state of facts. *  *  *

"*  *  * We adopt the rule supported by the great weight of authority in the United States that a statute prohibiting under penalty the driv-

ing of a motor vehicle on a public highway at a speed greater than is reasonable and proper, or so as to endanger life, limb or property is not void for indefiniteness.''

In *Pehl v. State* (Tex Cr App), 223 SW2d 238, the appellant had been found guilty of the crime of negligent homicide of the first degree. The statute provided:

"Whoever, in the performance of a lawful act, shall by negligence and carelessness cause the death of another is guilty of negligent homicide of the first degree."

The appellant claimed that the statute was void for want of due process and for failure to state with reasonable certainty the elements of the offense. In rejecting the contentions, the court declared:

"Article 1231 of the Penal Code has furnished the basis for many prosecutions. So far as we are able to ascertain, this is the first time the exact attack has been made on it. However, its constitutionality has been impliedly passed upon many times. We do not deem it necessary to enter into a discussion of the authorities cited in appellant's brief. We have given careful attention to them and are not in accord with the contention made."

The decision from which we just quoted was preceded by *Young v. State* (Tex Cr App), 47 SW2d 320, which affirmed the defendant's conviction of the crime of aggravated assault. The conviction was based upon the defendant's act in driving his automobile down a narrow city street at a speed of about 45 miles an hour, thereby injuring a child. The defendant moved to quash the information upon the ground that the statute creating the crime was vague and indefinite. The statute required that the act must be done "wilfully, or with negligence, as is defined in this title in the chapter

on negligent homicide." We now quote from the decision:

"Appellant also urges in his said motion to quash that the chapter on negligent homicide (chapter 14 [article 1230 et seq.]) referred to in article 1149, supra, nowhere contains anything which purports to be a definition of negligence. We are not in accord with this contention. In said chapter 14, in article 1233 thereof, it is said: 'the want of proper care and caution distinguishes this offense from excusable homicide,' the latter having been defined in the preceding chapter 13, P. C. (articles 1228, 1229). The further statement is made in said article 1233: 'The degree of care and caution is such as a man of ordinary prudence would use under like circumstances.' It may be doubted if there is greater unanimity among the courts of all jurisdictions upon any one thing than in the general definition of negligence, as being a failure to do what a man of ordinary care and prudence would do under the same or like circumstances."

The People v. Garman, 411 Ill 279, 103 NE2d 636, held valid a statute which reads as follows:

"Any person who drives a vehicle with reckless disregard for the safety of others and thereby causes the death of another person shall be guilty of the offense of reckless homicide."

The court said:

"In *People* v. *Green,* 368 Ill. 242, this court departed in part from the holding of the *Beak case,* stating the true rule to be that if the legislature, in creating a new crime, uses words having a common-law meaning or a meaning made definite by statutory definition or previous judicial construction, it may strike directly at the end intended to be curbed, * * *. The Indiana case of *State* v. *Beckman,* 219 Ind. 176, quoted 'reckless disregard of the safety of others' as a part of Blackstone's common-law definition of manslaughter. It is thus evident that the phrase itself has a common-law

definition of its own, descriptive of certain acts. Following the *Green case,* decided by this court, we will look to the common-law meaning of the phrase to define the acts constituting a violation of the statute. We thus observe that our statute is rendered certain and definite, and is not violative of due process in this respect.''

We pause upon the decision just reviewed for the purpose of taking note of a fact to which we have already alluded; that is, that in our state the word ''negligence'' is expressly defined by ORS 161.010. Again, ORS 132.710 says:

''The words used in an indictment must be construed in their usual acceptation, * * *, except words and phrases defined by law, which are to be construed according to their legal meaning.''

Further, ORS 42.250 says:

''The terms of a writing are presumed to have been used in their primary and general acceptation * * *.''

The decisions reviewed in the preceding paragraphs were based upon statutes similar to, or closely resembling, the act under attack. In sustaining the legislation above reviewed, the courts rejected contentions which were counterparts of those made by the defendant, with the exception of the one which he predicates upon Article I, section 15, Oregon Constitution. Unless we misread the defendant's brief, his principal argument against the validity of the negligent homicide statute is that the latter's terms are vague and do not enable a motorist to know when his driving transgresses the law. He points to the fact that the challenged statute does not include any requirement of moral culpability, but that argument is intended to amplify his contention that statutes which depend upon criteria of a general nature must include an element of mens rea lest a

person of good purposes become enmeshed unwittingly in their violation.

We shall now review the cases concerning the operation of motor vehicles which the defendant cites.

From Ex parte Chernosky (Tex Cr App), 217 SW2d 673, we quote:

> "We are constrained to agree that, in so far as the statute authorizes prosecutions merely for the driving of an automobile upon a public highway of this State 'without due caution or circumspection' it is vague and indefinite and falls within the condemnation of statutory and constitutional guarantees."

The court continued:

> "It should be here expressly pointed out that we are not construing Sec. 51 of Art. V, either as a whole or the provision thereof relating to the driving of an automobile 'without due caution or circumspection,' where used in connection with the other provisions of wilfulness and disregard of the rights and safety of a person or property which connote criminal negligence."

The Chernosky opinion did not mention *Young v. State,* which we reviewed in a preceding paragraph, and in which the court said:

> "It may be doubted if there is greater unanimity among the courts of all jurisdictions upon any one thing than in the general definition of negligence."

Manifestly, the Chernosky opinion did not undertake to repudiate the assertion just quoted. In 27 Ky Law Jour 111 it is stated:

> "The courts of the State of Texas have followed the tort standard of care closer than any other jurisdiction and apply it in all instances of negligent homicide."

*State v. Lantz,* 90 WVa 738, 111 SE 766, held void a part of a statute enacted in 1921 which read as follows:

"Upon approaching  *   *   *  a sharp  *   *   * curve  *   *   *  and in traversing such  *   *   * curve, a person operating a motor vehicle or motorcycle shall have the same under control and shall reduce in speed to a reasonable and proper rate."

The court deemed the above part vague, indefinite and invalid. It said:

"Nobody would know, until after the trial was had, and a judgment rendered, what the law was. No man, in driving an automobile around a curve, would have any criteria by which he could determine at what speed the same might be operated without committing a violation of the criminal law."

The Lantz decision was distinguished in *State v. Mangus,* 120 WVa 415, 198 SE 872, which held a statute constitutional which made it a crime to drive "carelessly and heedlessly in wilful or wanton disregard of the rights or safety of others, or without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or property." In sustaining the validity of that statute, the court noted: "The last thirty years have brought into daily use in the United States millions of motor vehicles." It observed that "Experience has proven that all too often those in charge of such vehicles are strangely indifferent to the welfare of others." The Lantz decision was again distinguished in *State v. Hamilton,* 133 WVa 394, 56 SE2d 544, where the statute construed in *State v. Mangus* was once more before the court. In the Hamilton decision, the court declared:

"*   *   *  Statutes creating and defining the crime of reckless driving similar in form to that of the statute now under consideration have been

sustained in many other states and are recognized as valid by the decided weight of authority.''

*Hayes v. State,* 11 Ga App 371, 75 SE 523, decided in 1912, is mentioned four times in the defendant's brief and in one place is honored by extensive quotation. The Hayes decision had as its subject matter a Georgia statute enacted in 1910 which rendered penal the operation of an automobile ''at a rate of speed greater than is reasonable and proper, having regard to the traffic and use of such highway, or so as to endanger the life or limb of any person or the safety of any property.'' It held the provision just quoted ''too uncertain and indefinite in its terms to be capable of enforcement.'' We quote again from the decision:

> ''What rate of speed is reasonable and proper? Who should determine this question? What is the test as to the rate of speed which can be employed, and how is the driver of an automobile to know when he is driving at a rate of speed prohibited by the act? Manifestly, this question cannot be determined by the consequences which ensue from driving a machine. The law must so definitely and certainly define the offenses that a person of reasonable understanding can know at the time of the commission of the act that the law is being violated. One jury might say that a certain rate of speed was reasonable and proper. Another jury might reach exactly the opposite conclusion from exactly the same state of facts and the same circumstances.''

We now turn to *Gaines v. The State,* 80 Ga App 512, 56 SE2d 772, which was written thirty-seven years after the Hayes decision and when greater experience had been had with automobile operation and traffic laws:

> ''* * * In Ray v. State, 47 Ga. App. 22, 23, (169 S.E. 538), it is said: 'This court in the case of Hayes v. State, 11 Ga. App. 371 (75 S. E. 523)

held the act of 1910, making it criminal to operate an automobile on a public highway at a rate of speed greater than is reasonable and proper, having regard to the traffic and use of such highway so as to endanger life, etc., too uncertain and indefinite in its terms to be capable of enforcement. While this is the rule adopted by the courts of review of this State, it may be well to state that it is not in accord with the rule adopted in a majority of the States, and a statute similarly worded is held in other States to be sound, and not too vague and uncertain. They say further, that, after all, juries are and should be the judges of the particular facts of each case, and the fact that one jury might decide one way and another jury the other is no reason to declare a law null and void. The decision in the Hayes case has been criticized by courts of other States. Schultz v. State, 89 Neb. 34 (130 N. W. 972, 33 L. R. A. (N.S.) 403, Ann. Cas. 1912C, 495); State v. Schaeffer, 96 O St. 215 (117 N. E. 220, L. R. A. 1918B, 945 Ann. Cas. 1918E, 1137); Maxon v. State, 177 Wis. 379 (187 N. W. 753, 21 A. L. R. 1484); 26 A. L. R. 898. The "rule of reason" doctrine enunciated by the United States Supreme Court in Standard Oil Co. v. United States, 221 U. S. 1 (31 Sup. Ct. 502, 55 L. ed 619, 34 L. R. A. (N.S.) 834, Ann. Cas. 1912D, 734), is also in conflict with the principle in the Hayes case. Our own courts, in passing on questions of public indecency or otherwise indecently acting, made the jury the sole judges of what is or is not indecent acting, according to the time, place and circumstances surrounding the act. We are bound, however, by the decision in the Hayes case.' After so stating, the court in the Ray case thereupon proceeded to hold: 'The act of 1927 (Ga. L. 1927, p. 237) which declares that "An operator overtaking and desiring to pass a vehicle shall blow his horn, and the operator of the vehicle so overtaken shall promptly, upon such signal, turn his vehicle as far as reasonably possible to the right, in order to allow free passage on the left of his vehicle," is not void because of being too vague and indefinite to be capable of enforcement.' The ap-

plication for certiorari was denied by the Supreme Court in that case. In Lester v. State, 51 Ga. App. 146 (179 S.E. 869), citing the Ray case as authority, it was held: 'There is no special demurrer to the indictment and, reduced to its last analysis, the sole question presented by the general demurrer is whether or not the following part of the motor-vehicle law (Ga. L. 1927, p. 237, section 12 (d), Code of 1933, § 68-303 (d)) is so vague and indefinite as to be void: "An operator of a vehicle overtaking another vehicle going in the same direction, and desiring to pass the same, shall pass to the left of the vehicle overtaken, provided that the way ahead is clear of approaching traffic, but if the way is not clear, he shall not pass unless the width of the roadway is sufficient to allow his vehicle to pass to the right of the centre thereof in the direction in which his vehicle is moving." Held, that the only part of the statue subject to attack for indefiniteness, to wit, the phrase "clear of approaching traffic," is not so vague and indefinite as to invalidate the statute, and that the court did not err in overruling the demurrer to the indictment.' In Collins v. State, 51 Ga. App. 147 (179 S. E. 869), this court followed the Ray case and the Lester case. In all of the cases which have been decided by this court since the decision in the Hayes case, the Hayes case has not been cited, unless the precise question was involved, except to distinguish it from the case then under consideration and in some cases the court has even gone further when it followed the Hayes case, and said that they only did so because they were bound by that case."

Next, the defendant's brief cites and quotes from Justice Potter's opinion in *People v. Maki,* supra. It acknowledges that Justice Potter's views did not prevail, but describes his opinion as "scholarly and magnificently logical." A preceding paragraph of this decision gives sufficient attention to that opinion.

Finally, the defendant's brief acclaims *Rex v. Bateman,* 19 Crim App Rep 8, a decision by the Court of Criminal Appeals. That decision arose out of a charge of manslaughter made against a medical practitioner who, according to the charge, failed to employ the requisite degree of care in the performance of professional service. The court held:

> "To support an indictment for manslaughter the prosecution must prove the matters necessary to establish civil liability (except pecuniary loss), and, in addition, must satisfy the jury that the negligence or incompetence of the accused went beyond a mere matter of compensation and showed such disregard for the life and safety of others as to amount to a crime against the State and conduct deserving punishment."

*Andrews v. Director of Public Prosecutions,* 26 Crim App Rep 34, decided by the House of Lords in 1937, is more recent than *Rex v. Bateman.* It was based upon a charge of manslaughter which was filed against the driver of a motor vehicle who, while attempting to overtake a car ahead, ran down a pedestrian. The charge to the jury spoke of recklessness and of driving "in a dangerous manner." The accused was found guilty and was sentenced to 15 months' imprisonment. Further, the sentence disqualified him for life from holding a driver's license. The instructions to the jury were the subject of attack in the House of Lords. In affirming the judgment, Lord Atkin, in referring to the earlier decisions upon manslaughter, stated:

> "Expressions will be found which indicate that to cause death by any lack of due care will amount to manslaughter, but as manners softened and the law became more humane a narrower criterion appeared. * * * The stricter view became apparent in prosecutions of medical men or men who professed medical or surgical skill for manslaughter by reason of negligence."

Next, he declared:

"The principle to be observed is that cases of manslaughter in driving motor-cars are but instances of a general rule applicable to all charges of homicide by negligence. Similar lack of care such as will constitute civil liability is not enough. For purposes of the criminal law there are degrees of negligence, and a very high degree of negligence is required to be proved before the felony is established. Probably of all the epithets that can be applied 'reckless' most nearly covers the case. It is difficult to visualize a case of death caused by 'reckless' driving in the connotation of that term in ordinary speech which would not justify a conviction of manslaughter. But it is probably not all-embracing, for reckless suggests an indifference to risk, whereas the accused may have appreciated the risk and intended to avoid it and yet shown such a high degree of negligence in the means adopted to avoid the risk as would justify a conviction."

The other members of the court concurred in Lord Atkin's opinion.

Lord Atkin's conception of the law, of which we have just taken notice, created disappointment. Manslaughter and Dangerous Driving, 53 Law Quar Rev 380, which appeared shortly after the pronouncement of Lord Atkin, said:

"It had been hoped that the decision of the House of Lords in *Andrews v. Director of Public Prosecutions* would go some way towards clarifying the difficult question of the degree of negligence required in that form of manslaughter which arises from an unintentional killing caused by an omission to take care. The decision as reported, however, sheds little further light upon the problem. * * * It is also true that Lord Atkin makes it sufficiently clear that the degree of negligence required for the felony of manslaughter is different from and higher

than that required in the misdemeanour created by section 11; * * *.''

We interrupt the quotation for the purpose of stating that by ''section 11'' reference was made to the English Road Traffic Act, 1934. Going on, the treatise stated:

''* * * it is therefore stated that in summing up to a jury on a trial of manslaughter (on an indictment for which by section 34 of the Road Traffic Act, 1934, the jury may convict by dangerous driving), it is the duty of the judge to direct the jury first as to the high degree of negligence required for manslaughter, secondly to explain that this is not necessarily the same degree of negligence as that required for the offence of dangerous driving, and thirdly to indicate under what conditions they may acquit the accused of the more serious and convict of the lesser offense.

''But, it is submitted, this statement of the function of the judge leaves unanswered the vital question, which is to discover what are the conditions mentioned by Lord Atkin, or, stating the problem in another form, what is the definition of the degree of negligence which is necessary to justify a conviction for manslaughter and in what way such negligence differs from the negligence involved in dangerous driving.

* * * * *

''The contribution of the House of Lords is not very illuminating. It is stated that a 'very high degree of negligence is required and that of all the epithets that can be applied ''reckless'' most nearly covers the case. . . . But it is probably not all-embracing, for ''reckless'' suggests an indifference to risk, whereas the accused may have appreciated the risk and intended to avoid it and yet shown such a high degree of negligence in the means adopted to avoid the risk as would justify a conviction.' Thus we are told that the test of 'recklessness', *i.e.* foresight of the possibility of endangering others and a determination to take the risk, is not the only element in the mental attitude

of the accused. \* \* \* But according to Lord Atkin there may be another form of negligence, *viz.* a high degree of carelessness, and it is just this element, which is so often the best that the prosecution can prove, which has caused the confusion.''

Let us return for a moment to *Rex v. Bateman,* supra. In it the court stated:

''To support an indictment for manslaughter the prosecution must prove the matters necessary to establish civil liability (except pecuniary loss), and, in addition, must satisfy the jury that the negligence or incompetence of the accused went beyond a mere matter of compensation and showed such disregard for the life and safety of others as to amount to a crime against the State and conduct deserving punishment.''

Concerning that delineation of the crime of manslaughter, we now revert to the treatise from which we quoted:

''\* \* \* This, as Lord Atkin observes, is not helpful either to judges or juries, for it is no definition of a crime at all that contains the word 'crime' or 'criminal' on both sides of the legal equation.''

The treatise showed that as a result of the decision by the House of Lords, negligence in England assumes three forms: (1) one for civil liability; (2) a higher degree for manslaughter; and (3) a different degree for "dangerous driving" under the Roard Traffic Act. The treatise closed with the observation:

''In conclusion it is respectfully submitted that it is most unsatisfactory that the second most serious felony in English law should be delineated so imperfectly at this late stage of our legal development.''

It is evident that the advent of the automobile and the ever-increasing number of casualties inflicted by its operation have created problems which the English

courts have not been able to solve satisfactorily while attempting to display fealty—possibly faltering fealty —to the ancient rule that manslaughter requires proof of nothing less than gross negligence. In Manslaughter and Dangerous Driving, 53 Law Quar Rev 380, it is stated:

"It has for long been the rule of English law that 'gross' negligence is required in manslaughter."

And see Mens Rea and Motorists, 5 Cambridge Law Jour 61.

We now revert to a case which had its inception in Oregon and which later received illuminating treatment in the Federal Supreme Court. *State v. Miller,* 119 Or 409, 243 P 72 (affirmed per curiam 273 US 657) approved a judgment of the circuit court which found the defendant guilty of involuntary manslaughter. The indictment charged the defendant with

"Driving a motor vehicle in a careless and imprudent manner, and at a dangerous rate of speed, committed as follows,"

At that point the indictment added:

"in a careless and imprudent manner and at a high, unreasonable, imprudent, reckless and dangerous rate of speed, and at a rate of speed that did then and there endanger the life and limb of a certain person, to-wit, one Alma Paul, who was then and there upon said public highway * * *."

The defendant demurred to the indictment and, at the close of the state's case in chief, moved for a dismissal. The opinion states:

"* * * it is important to bear in mind that the state charges decedent was killed by defendant in the commission of an unlawful act. It is not a case of involuntary manslaughter predicated on the doing of a lawful act 'without due caution or circumspection,' * * *."

The alleged "unlawful act" was the negligent operation of the automobile. In appealing, the defendant did not challenge the validity of the statute, but contested the sufficiency of the indictment. In sustaining the latter, the decision said:

"* * * The allegations of the defendant's alleged unlawful act in driving his automobile at a dangerous and unreasonable rate of speed follows the language of subdivision 16, Section 2, Chapter 371, Laws of Oregon for 1921, which provides as follows: * * *."

The statute provided that motorists

"shall drive the same in a careful and prudent manner, not to exceed thirty miles per hour * * *, and in no case at a rate of speed that will endanger the property of another, or the life and limb of any person."

Thus, the indictment followed the words of the statute. The decision declared:

"This pleading is sufficient in view of the fact that the defendant is definitely apprised of the nature and cause of the accusation against him: * * * Can it reasonably be contended that the defendant, or any person of common understanding, after reading this indictment would not know the nature and character of the crime charged? Was there any danger under such allegations that the defendant would be taken by surprise in the course of the trial? We think not. The indictment certainly charges the crime of involuntary manslaughter."

A memorandum opinion in 273 US 657, approved *State v. Miller* by saying: "Affirmed on the authority of *Nash v. United States*, 229 US 373." The Nash decision was based upon indictments which accused the defendant of (a) a conspiracy in restraint of trade and (b) a conspiracy to monopolize trade. A demurrer was filed to the double indictment on the ground that

the statute upon which the indictment was based was so vague as to be inoperative as a criminal law. In sustaining the validity of the statute, the court said:

"But apart from the common law as to restraint of trade thus taken up by the statute the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death. 'An act causing death may be murder, manslaughter, or misadventure according to the degree of danger attending it' by common experience in the circumstances known to the actor. 'The very meaning of the fiction of implied malice in such cases at common law was, that a man might have to answer with his life for consequences which he neither intended nor foresaw.' *Commonwealth* v. *Pierce,* 138 Massachusetts, 165, 178. *Commonwealth* v. *Chance,* 174 Massachusetts, 245, 252. 'The criterion in such cases is to examine whether common social duty would, under the circumstances, have suggested a more circumspect conduct.' 1 East P. C. 262. If a man should kill another by driving an automobile furiously into a crowd he might be convicted of murder however little he expected the result. See *Reg.* v. *Desmond,* and other illustrations in Stephen, Dig. Crim. Law, art 223, 1st ed., p. 146. If he did no more than drive negligently through a street he might get off with manslaughter or less. *Reg.* v. *Swindall,* 2 C. & K. 230; *Rex v. Burton,* 1 Strange, 481. And in the last case he might be held although he himself thought that he was acting as a prudent man should. See *The Germanic,* 196 U. S. 589, 596. But without further argument, the case is very nearly disposed of by Waters-Pierce Oil Co. v. Texas (No. 1), 212 U. S. 86, 109, where Mr. Justice Brewer's decision and other similar ones were cited in vain. We are of opinion that there is no constitutional difficulty in the way of enforcing the criminal part of the act."

The court said that "the Sherman Act punishes the conspiracies at which it is aimed on the common law footing".

Before proceeding further with *State v. Miller,* it is necessary to take note of *Cline v. Frink Dairy Co.,* 274 US 445, 47 SCt 681, 71 L Ed 1146, which held that the Colorado anti-trust law lacked a fixed standard for determining guilt and that it, therefore, required juries, in cases based upon the act, to perform legislative, not judicial, functions. In reaching its conclusion, the decision, written by Chief Justice Taft, gave attention to some of the authorities which the defendant in the case at bar commends to our attention: *United States v. Cohen Grocery Co.,* 255 US 81, 41 SCt 298, 65 L Ed 516, 14 ALR 1045; *International Harvester Co. v. Kentucky,* 234 US 216, 34 SCt 853, 58 L Ed 1284; *Connally v. General Construction Co.,* 269 US 385, 46 SCt 126, 70 L Ed 322; and *Collins v. Kentucky,* 234 US 634, 34 SCt 924, 58 L Ed 1510. *United States v. Cohen Grocery Co.* was concerned with the federal food control act, and held that the phrase of that act, "any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries" set up no ascertainable standard and was repugnant to the Fifth and Sixth Amendments. *International Harvester Co. v. Kentucky* was based upon four items of Kentucky legislation which dealt with the subject of combinations to control prices. The legislation was held unconstitutional as violative of the Fourteenth Amendment. It offered no standard of conduct to guide a person before he acted. *Connally v. General Construction Co.* held invalid an Oklahoma statute which imposed penalties upon contractors with the state who paid their workmen less than the "current rate per diem wages in the locality where the work is performed." In holding the act void for uncertainty,

the court cited the due process clause. *Collins v. Kentucky* deemed invalid a Kentucky statute which authorized persons who produced commodities to form pools or combines for the purpose of obtaining better prices. The act was held violative of the Fourteenth Amendment because it prescribed no standard of conduct. Before returning to the Cline decision, we take the following from the International Harvester opinion:

"* * * It goes no further than to recognize that as with negligence, between the two extremes of the obviously illegal and the plainly lawful there is a gradual approach and that the complexity of life makes it impossible to draw a line in advance without an artificial simplification that would be unjust. The conditions are as permanent as anything human, and a great body of precedents on the civil side coupled with familiar practice make it comparatively easy for common sense to keep to what is safe."

Those words are significant. We have seen that a statute of this state, as well as the common law, defines the word "negligence". The fact that the definition fails to indicate the course which a prudent person would take under the circumstances of any case before a court may be deemed a deficiency in the definition. But the judicial output of several centuries has given us "a great body of precedents" which supply some of the wants and render the definition workable. That situation was not present in the International Harvester case. There, it was claimed that the defendant (Harvester Company) had combined with others for the purpose of enhancing prices. Under Kentucky law, combinations were lawful if they went no further than to restore an equilibrium that had been disturbed by a combination of buyers or by other factors. They were unlawful only if they had the effect of fixing a

price that was greater or less than the real value of the article. Thus, if the law was valid, a person, in the exercise of his right to combine with others, was forced to guess the real value which his article would have possessed if no adverse combination had been formed. It was for that reason that the act was struck down. We now reach the part of the Cline decision which has direct bearing upon the case before us:

> "'* * * Following the authority in the *Nash* case, we sustained in *Miller* v. *Oregon, per curiam,* 273 U. S. 657, a conviction of manslaughter under a statute of Oregon, which made the following rule of conduct a standard of criminality:

> " 'Every person operating a motor vehicle on the public highways of this state shall drive the same in a careful and prudent manner, not to exceed thirty miles per hour, and within the limit of incorporated cities and towns not to exceed twenty miles per hour, and at intersections and schoolhouses not to exceed twelve miles per hour, and in no case at a rate of speed that will endanger the property of another or the life or limb of any person.' (Ch. 371, General Laws of Oregon, 1921, § 2, subdivision 16.)

> "The indictment was framed under the last clause of this statute. Such standard for the driver of an automobile on a highway is one to which it is neither harsh nor arbitrary to hold those criminally who operate such a possibly dangerous instrument of locomotion, and who are or ought to be aware of what degree of care is necessary to avoid injury to others under the conditions that prevail on a highway.''

It will be observed that the Oregon statute which the court quoted in the Cline decision, and which was held free from infirmity, was expressed in part in words which had gained for themselves well-established legal meanings. For example, one of the act's terms was this, "careful and prudent manner". Scores, if

not hundreds, of decisions illustrate the definition which has been given to that term. Thus, "a great body of precedents" aids anyone who falters upon the import of "careful and prudent manner". Upon the other hand, the statutes governing the business, economic and trade activities, which were condemned in the Supreme Court decisions cited in our review of the Cline case, were phrased in diction which neither the dictionaries nor the language of the law rendered sufficiently certain in meaning so that those who wished to engage in those activities could determine whether his contemplated course of action would constitute a violation of the law.

From the viewpoint of the issues presented by the defendant in the case at bar, the statute which received approval in *State v. Miller* was not materially different from the one now before us. Both, in regulating the manner in which motor vehicles may operate, employ words of long-established legal use. Judicial interpretation has hemmed in the import of the controlling terms of both statutes until the meaning of each word is in a closely confined corral; and the definitions which the courts have assigned to the controlling words are illustrated by the facts of numerous decisions.

*State v. Schriber,* 185 Or 615, 205 P2d 149, and *State v. Anthony,* 179 Or 282, 169 P2d 587, are in accord with the principles enunciated in the decisions of the Federal Supreme Court which we reviewed in preceding paragraphs, and illustrate the operation of those principles.

*State v. Anthony,* supra, elucidates the manner in which the meaning of a statute can be made certain by employing words of established meaning. It reiterated the rule that legislation which creates a crime

unknown to the common law must be expressed in clear language. It said:

"* * * in the creation of an offense which was not a crime at common law a statute must be sufficiently certain to show what the legislature intended to prohibit."

Then it evinced the way in which the needed clarity can be achieved. Through resort to a text, it said:

"In the absence of provision to the contrary, a statute may punish an offense by giving it a name known to the common law, without further defining it, and the common-law definition will be applied."

The decision cited authorities showing that a statute's use of terms which possess established meanings may render its purpose clear and thus enable it to escape condemnation under the due process clause of the Fourteenth Amendment.

*State v. Schriber,* supra, illustrates well the operation of the rule that the use of terms which have an ascertainable meaning may render the statute's meaning certain. The penal statute under scrutiny in that case provided punishment for anyone who had in his possession cattle afflicted with Bang's disease, but did not define the term. Clearly, this was an instance of the creation of a new offense by a statute which did not define the meaning of an important phrase which it employed. The circuit court held the statute invalid after finding that the term Bang's disease had no established meaning. Referring to that finding, our decision declared, "We do not agree." By resort to dictionaries, legislation, encyclopedias, medical treatises, public discussion, judicial decisions and bulletins published by agricultural colleges, the decision demonstrated that the meaning of the term "Bang's disease" could be ascertained with certainty. The decision went on to show how courts may acquaint themselves with

the material which is necessary to unlock the meaning of technical terms employed in statutes by pointing out:

"It is well-established that courts take judicial notice of medical and other scientific facts relating to human life and health and that, since judicial cognizance may extend to matters beyond the actual knowledge of the judge, he may properly resort for information to dictionaries, encyclopedias, learned treatises and the like."

The Schriber decision was not deterred by the fact that some book or other may not give a complete definition of the term in issue or may contain an inaccurate definition, for it said:

"* * * The fact that a dictionary definition fails to disclose completely and accurately all the manifestations of the disease is not sufficient basis for concluding that the name which it bears has no accepted and commonly understood meaning."

The statute was sustained.

But, as we have seen, the defendant argues that unless a criminal statute includes as one of the elements which constitute the crime a culpable state of mind, the due process clause condemns it. We do not believe that any decision reviewed in the preceding paragraphs concerning motorists sustains the defendant's contention, with the possible exception of *Andrews v. Director of Public Prosecutions,* supra. However, in that case, Lord Atkin declared: "I do not myself find the connotations of *mens rea* helpful in distinguishing between degrees of negligence, * * *."

The position taken by the defendant finds support in *State v. Prince,* 52 NM 15, 189 P2d 993, which deemed repugnant to the due process clause of the Fourteenth Amendment a statute which read:

"Any person being in the possession of the property of another, who shall convert such property to

his own use, or dispose of such property in any way not authorized by the owner thereof, or by law, shall be guilty of embezzlement * * *."

The court found:

"The essential elements of the offense of embezzlement are: * * * (c) That there was a fraudulent intent to deprive the owner of his property."

Before condemning the statute, the court declared:

"* * * The statute cannot be extended or sustained as a reasonable exercise of police power."

Then it ruled:

"A penal statute should define the act necessary to constitute an offense with such certainty that a person who violates it must know that his act is criminal when he does it. Then can it be said a person having property of another in his possession, which he believes to be his own, could possibly know that he had violated the law when he sells it or otherwise appropriates it to his own use. But it clearly appears from reading the statutes in question, such appropriation is made a crime. Under its terms there is no defense for simple conversion, and to make an act, innocent itself, a crime, and criminals of those who might perchance fall within its interdiction, is inconsistent with law. The statute is uncertain in its meaning, vague and indefinite. A person charged thereunder is deprived of due process of law, in violation of the Fourteenth Amendment of the Constitution of the United States."

Thus, the effort of New Mexico to hold to strict criminal liability one who had been entrusted with the money of another failed.

In 1846 *Regina v. Woodrow*, 15 M & W 404, held a retail dealer guilty of having adulterated tobacco in his possession even though he had no knowledge of the

adulteration or cause to suspect it. The governing statute said nothing about knowledge, intent or negligence in failing to discover adulteration. In reversing the dismissal of the prosecution, Chief Baron Pollock declared:

> "So you are here wilfully disobeying the act of Parliament, if you do not take due pains to examine the article in which you deal, and to ascertain, before you receive it, that it is of character which the law permits you to have."

At that point, counsel protested, "That might require a nice chemical analysis", and received the reply, "You must get someone to make that nice chemical analysis, or you must rely upon the manufacturer, or * * *." Baron Parke spoke in this vein:

> "It is very true that in particular instances it may produce mischief, because an innocent man may suffer from his want of care in not examining the tobacco he has received, and not taking a warranty; but the public inconvenience would be much greater, if in every case the officers were obliged to prove knowledge. They would be very seldom able to do so."

*Regina v. Stephens,* LR 1 QB 702, another public welfare case, reached the same result as the Woodrow decision. It arose out of the pollution of a stream. The defendant's knowledge, or lack thereof, of the pollution which resulted from his operations was held immaterial.

*United States v. Balint,* 258 US 250, 42 SCt 301, 66 L Ed 604, held to strict criminal accountability one who was accused of violation of the federal Narcotic Act. The latter authorized as penalty a term not exceeding five years. The decision, which was unanimous and which was written by Chief Justice Taft, declared:

> "While the general rule at common law was that the *scienter* was a necessary element in the

indictment and proof of every crime, and this was followed in regard to statutory crimes even where the statutory definition did not in terms include it (*Reg. v. Sleep,* 8 Cox C. C. 473), there has been a modification of this view in respect to prosecutions under statutes the purpose of which would be obstructed by such a requirement. It is a question of legislative intent to be construed by the court. It has been objected that punishment of a person for an act in violation of law when ignorant of the facts making it so, is an absence of due process of law. But that objection is considered and overruled in *Shevlin-Carpenter Co. v. Minnesota,* 218 U. S. 57, 69, 70, in which it was held that in the prohibition or punishment of particular acts, the State may in the maintenance of a public policy provide 'that he who shall do them shall do them at his peril and will not be heard to plead in defense good faith or ignorance.' Many instances of this are to be found in regulatory measures in the exercise of what is called the police power where the emphasis of the statute is evidently upon achievement of some social betterment rather than the punishment of the crimes as in cases of *mala in se.*   *   *   *   So, too, in the collection of taxes, the importance to the public of their collection leads the legislature to impose on the taxpayer the burden of finding out the facts upon which his liability to pay depends and meeting it at the peril of punishment. *Regina v. Woodrow,* 15 M. & W. 404; *Bruhn, v. Rex,* [1909] A. C. 317. Again where one deals with others and his mere negligence may be dangerous to them, as in selling diseased food or poison, the policy of the law may, in order to stimulate proper care, require the punishment of the negligent person though he be ignorant of the noxious character of what he sells.''

*United States v. Behrman,* 258 US 280, 42 SCt 303, 66 L Ed 619, states:

"*   *   *   If the offense be a statutory one, and intent or knowledge is not made an element of it, the indictment need not charge such knowledge or intent.''

*State v. Prince,* supra, did not mention *Regina v. Woodrow,* supra, *Regina v. Stephens,* supra, *United States v. Balint,* supra, or *United States v. Behrman,* supra.

*Morissette v. United States,* 342 US 246, 72 SCt 240, 96 L Ed 288, arose out of a charge based upon an embezzlement statute which read:

> "Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys, or disposes of any record, voucher, money or thing of value of the United States or of any department or agency thereof or any property made or being made under contract for the United States or any department or agency thereof;
>
> "Shall be fined * * * or imprisoned * * *."

The defendant, while hunting game upon a tract of uninhabited land which had been used by the armed forces as a practice bombing range, encountered a quantity of spent bomb casings which he thought were abandoned and unwanted. Having found no game, he loaded three tons of the casings upon his truck and, after flattening them, derived $84 from their sale. Upon conviction he was sentenced to two months' imprisonment and to the payment of a fine of $200. The trial judge ruled:

> "I will not permit you to show this man thought it was abandoned—. I hold in this case that there is no question of abandoned property."

In the decision above cited, the court held that the statute's silence upon the mental element did not indicate that Congress intended to eliminate from the crime a culpable state of mind. Although the New Mexico court depended upon the United States Constitution as the basis for condemning the New Mexico statute, the Morissette opinion did not deem the federal statute

unconstitutional, but held that a culpable state of mind remained an element of the crime of embezzlement even though the statute did not expressly name it. It read the element into the statute.

The Morissette decision gave express attention to *United States v. Balint,* supra, and *United States v. Behrman,* supra. It mentioned *Regina v. Woodrow,* supra, and *Regina v. Stephens,* supra, in its footnotes. After citing the Balint and Behrman decisions, it said:

> "* * * In those cases this Court did construe mere omission from a criminal enactment of any mention of criminal intent as dispensing with it. * * * The crimes there involved depend on no mental element but consist only of forbidden acts or omissions."

After mentioning the industrial revolution and the complex mechanisms which it produced, it continued in this vein:

> "* * * Traffic of velocities, volumes and varieties unheard of came to subject the wayfarer to intolerable casualty risks if owners and drivers were not to observe new cares and uniformities of conduct. Congestion of cities and crowding of quarters called for health and welfare regulations undreamed of in simpler times. Wide distribution of goods became an instrument of wide distribution of harm when those who dispersed food, drink, drugs, and even securities, did not comply with reasonable standards of quality, integrity, disclosure and care."

Shortly the decision added:

> "* * * Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it

might reasonably exact from one who assumed his responsibilities."

The court took note of the fact that, normally, the penalties exacted by laws of the kind just mentioned are not severe and do "no great damage to an offender's reputation". Under those conditions, so the decision held, statutes have been construed to mean that "the guilty act alone makes out the crime."

For a penetrating analysis of other decisions that have sustained the conviction of an accused without proof of a culpable state of mind in public welfare cases, see Hall, Principles of Criminal Law 281.

An article in 24 Indiana Law Journal 89 on the subject of mens rea, which contrasts the holding in *State v. Prince,* supra, with *United States v. Balint,* supra, discloses the difficulty which confronts anyone who attempts to devise a formula which will segregate the types of crimes in which mens rea is a required element from those in which it is not. In efforts to make the segregation, the distinction between crimes mala in se and mala prohibita, according to the author, is not helpful. And, since all criminal statutes are intended to serve the public welfare, he suggests that nothing is gained by saying that "public welfare statutes" do not call for an element of evil purpose, whereas others do. The Morissette opinion said:

"Neither this Court, nor, so far as we are aware, any other has undertaken to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not. We attempt no closed definition, for the law on the subject is neither settled nor static. The conclusion reached in the *Balint* and *Behrman* cases has our approval and adherence for the circumstances to which it was there applied."

■ It will be noticed that the Morissette opinion refrained from attempting to draw a "precise line" be-

tween the kinds of crimes in which mens rea is an essential element and those in which it is not. The article in the Indiana Law Journal which we cited likewise declined to become specific. However, those two dissertations may warrant an inference that, generally, the traditional crimes which are deemed infamous and which have always included mens rea as an element, require proof of culpability even when the crime is placed in statutory form by an enactment which is silent upon the subject. Very likely the same observation is warranted concerning modern variations and revisions of those crimes. But new crimes, created by legislative enactments in the nature of police regulations, and those which have become identified generally under the name of public welfare acts, may dispense with the mental element, especially if conviction under them does not result in great damage to the reputation of the defendant or severe punishment. Legislation of that kind finds its validity, as we saw from the Morissette opinion, in this line of reasoning:

> "* * * The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities."

The foregoing constitutes a sufficient review of the authorities. There remains the duty, which we now attempt to perform, of deducing from them the rules which govern the issues of this case.

A statute which creates a new crime must express itself with clarity so that those who are about to engage in the conduct which it endeavors to prohibit may know by reading the statute that they will be subject to punishment if they proceed. Nothing less than that is required by the due process clause of the Four-

teenth Amendment. The same clause renders invalid state penal laws which fail to set forth a standard with sufficient clarity so that those affected by them may know in advance whether or not their contemplated course of conduct will be lawful. The standard must be expressed with such clarity that persons of common intelligence, after reading the statute, will not be compelled to guess as to its import or be unable to determine with reasonable certainty those to whom it is applicable. However, the standard need not be defined with such precision that those affected by it will never be required to hazard their freedom upon correctly foreseeing the manner in which a matter of degree may be resolved by a jury. Although the decisions stress the importance of framing penal laws in terms which will readily disclose the acts and conduct which are proscribed, yet the courts realize the insuperable difficulty which a legislative draftsman would encounter if he were required to describe with precision every dangerous act which people may commit in carrying on a segment of their activities, such as motoring, and which he wishes to outlaw. Therefore, he may catlog a broad category of conduct which he wishes to prohibit by referring to it as negligent driving or reckless driving.

Such, in general, are the rules which govern the issue before us. Let us now return to decisions, such as *United States v. Morissette* for the purpose of determining whether it was essential to include in the crime of negligent homicide an element of mens rea.

■■ As we indicated in a preceding paragraph, negligent homicide statutes were adopted after the manslaughter acts had proved ineffective as a means of repressing the negligence in motor vehicle operation which was causing deaths upon the public thoroughfares. Possibly the success of the new legislation, if

it in truth achieved any, resulted from the fact that in common understanding manslaughter acts deal with brutal killings by a debased type of individual, whereas the motorist is generally a reputable citizen, and the wrong committed by him which brought someone to his death finds its counterpart in the driving of many others. *State v. Smith,* 198 Or 31, 255 P2d 1076, declares:

> "The Oregon Negligent Homicide Statute is not a lesser offense included within the crime of manslaughter."

The challenged act, as we see from the foregoing, is not a type of legislation which was known to the common law, nor is it a variant or modern adaptation of any of the traditional crimes. Since the offense is not a statutory version of any crime known to the common law, this is not an instance in which a court can infer, as was done in *State v. Prince,* supra, that an essential element was omitted which had been a detail of a common-law counterpart. Likewise, since this is a new crime, we cannot assume, as was done in *United States v. Morissette,* supra, that something was omitted from the statute with an expectation by the legislature that the courts in construing the act would read the missing part into it. The negligent homicide statute prohibits negligent driving, and the commission of the prohibited act (negligent driving) makes out the crime. The statute deems intent immaterial.

The Oregon negligent homicide statute, in selecting as its touchstone negligence, obviously, was prompted by a conviction that society can reasonably expect of motorists that they exercise due care and since that demand does not require much exertion upon the part of motorists, those who fail to meet the demand can reasonably be held to account. We shall para-

phrase one of the judicial utterances in *Regina v. Woodrow,* supra, by casting it in this form: "So you are here wilfully disobeying the act of the legislature if you do not take pains to drive carefully." The aim of the statute is not the imposition of vindictive punishment, but to save lives. Before any motorist is permitted to enter upon the public thoroughfares, he is required to apply for and receive an operator's license. ORS 482.010 through 482.990. Before a license is issued to him, the secretary of state is required to examine the applicant as to his "knowedge of the traffic laws of this state." Thus, if a licensed motorist violates a traffic law and thereby brings someone to his death, the rule that ignorance of the law is no excuse has a just foundation in the plenary demands of the licensing statute.

■ We are convinced that the negligent homicide statute is a police regulation, and that the legislature did not intend that any form of moral culpability should be an element of the offense. The crime created by the act is not one that casts great stigma upon those convicted, nor is the penalty prescribed by the act so great that its imposition upon those who had no evil purposes tends to shock the sense of natural justice.

Since ORS 161.010 defines the term "negligence", and since the judicial decisions unite in the same definition of it, as well as illustrate its application, we have unusual circumstances which lend clarity to the act's meaning. Furthermore, as we have just seen, every motorist, upon applying for a driver's license and its biennial renewal, is required to display familiarity with all traffic regulations. His familiarity with those regulations is further reason for concluding that the legislature could reasonably infer that the language in which they cast this act is clear in its import.

■ But the defendant advances other arguments

against the negligent homicide act which he believes show that it lacks clarity. He suggests that contributory negligence is not a defense under the statute, whereas it is a defense in a civil action based upon charges of negligence. This court has indicated that contributory negligence is not a defense against a charge of manslaughter. *State v. Newberg,* 129 Or 564, 278 P 568; *State v. Miller,* 119 Or 409, 243 P 72. However, the act, as we have seen, requires that the death of the person struck by the accused must occur "as the proximate result of injuries caused by" the accused. The defendant also points out that punitive damages in cases based upon charges of negligence cannot be awarded unless the party seeking them shows that the tort was intentional or was prompted by evil design. In actions in which punitive damages are sought, the party-plaintiff is not the state. Civil actions for damages, which are based upon charges of negligence, and criminal prosecution for negligent homicide have purposes which are materially different. The one generally seeks nothing but compensation; the other is intended to promote the public safety. Possibly the difference in the objectives of the two types of cases accounts for the distinction which the defendant mentions.

Without further analysis, we express our belief that the negligent homicide statute does not violate the due process clause of the Fourteenth Amendment. Likewise, it does not impinge up Article I, section 11, Constitution of Oregon, nor upon Article III, section 1. Article I, section 11, gives the defendant the right "to demand the nature and cause of the accusation against him." This act does not withhold that right. Article III, section 1, is the local adaptation of Montesquieu's doctrine of the separation of powers. The act does not require the jury to determine any issue of law.

The defendant presents an argument which was not submitted in any of the cases which we have reviewed. He bases it on Article I, section 15, Constitution of Oregon, which follows:

"Laws for the punishment of crime shall be founded on the principles of reformation, and not of vindictive justice."

The defendant argues that the act is too vague in its demands to permit a motorist to know when he has violated its terms and that, accordingly, he cannot know what improvements he should make in his driving. We do not think that the act is vague. We believe that if a motorist, through negligent driving, caused a death, he would have no trouble in reasoning out for himself the course he should pursue in the future. Finally, in *State v. Finch*, 54 Or 482, the defendant, who was a member of the bar and who had been sentenced to the gallows after having been found guilty of first degree murder, challenged the capital punishment statute on the ground that it violated the provision of the Constitution which we quoted. The argument was rejected as without merit.

The above disposes of all contentions advanced by the parties. It does not mention all of the authorities cited in the briefs, but all have received careful attention.

The judgment of the circuit court is reversed.