STATE, RESPONDENT, *v.* BAST, APPELLANT.

(No. 8510.)

(Submitted May 27, 1944. Decided September 29, 1944.)

[151 Pac. (2d) 1009.]

*Mr. James B. O'Flynn* and *Mr. T. W. Greer,* for Appellant, submitted an original and a reply brief; *Mr. O'Flynn* argued the cause orally.

*Mr. R. V. Bottomly,* Attorney General, *Mr. Fred Lay,* First Assistant Attorney General, and *Mr. Marshall Murray,* County Attorney, for the State, submitted a brief and argued the cause orally.

MR. JUSTICE ADAIR delivered the opinion of the court.

The defendant was charged with the crime of manslaughter, it being alleged that on July 31, 1943, in Flathead County, he "did wilfully, unlawfully, knowingly and feloniously kill one John Otho Herman, a human being." A trial was had and the jury returned a verdict of guilty leaving the punishment to be fixed by the court with an oral recommendation of lenience. The trial court sentenced defendant to the state prison and defendant appealed from the judgment.

The defendant's motion for the court to direct the jury to return a verdict of not guilty made at the close of the state's case was denied. The defendant here contends that the evidence is insufficient to support the verdict and judgment and that it was error for the trial court to deny his aforesaid motion.

The decision as to whether there is sufficient evidence to support the judgment of conviction must depend upon the circumstances of each case.

The defendant George Bast is a merchant operating the Super Cream Parlor in Kalispell. He is a widower. At about ten or fifteen minutes after eleven o'clock on the evening of July 30, 1943, he received, at his place of business, a telephone call from Mrs. Lew Cooper, a widow whom he had known for many years, asking him to join Mrs. Cooper and her sister, Mrs. Alphe Mc-Quirk, at the Vista Club in Kalispell. Upon closing his place of business for the night, Mr. Bast crossed the street to the Vista Club, arriving about 11:30 or 11:40 o'clock p. m. There he found the two sisters talking with John Otho Herman, a rancher. Mr. Bast and Mr. Herman were not previously acquainted but they were introduced by Mrs. McQuirk. Mr. Herman advised the group that he was going to Whitefish and he asked them to accompany him on the trip, requesting Mrs. McQuirk to drive his car. She advised him that she would not undertake it as she did not do much driving. Mr. Bast then said that he had not yet had his dinner and that it was a long time since breakfast, whereupon Mrs. Cooper volunteered to accompany Mr. Bast while he was getting his supper. Accordingly, after remaining at the Vista Club for but ten or fifteen minutes, Mr. Bast and Mrs. Cooper crossed the street to the Kalispell Cafe where Mr. Bast ordered his meal. While Mr. Bast was eating, Mr. Herman accompanied by Mrs. McQuirk entered the cafe and again Mr. Herman talked about driving to Whitefish. Mr. Bast suggested that he call a cab for the trip but Mr. Herman said: "What was the use of calling a cab. I have a car; don't you think I can drive it?" Mr. Bast replied: "Maybe you can and maybe you can't. I would rather take a cab which I have done always." Mr. Herman then threw his car keys on the table in front of Mr. Bast saying: "Here is my keys. There is no use in spending money for a cab." Mr. Bast replied: "That is the only way I will go."

At about fifteen or twenty minutes after twelve o'clock midnight the four left the cafe and climbed into Mr. Herman's car, a Plymouth sedan. Mr. Herman and Mrs. McQuirk seated themselves in the rear seat in which there was also a box of groceries,

a sack of flour and several sacks of feed while Mr. Bast and Mrs. Cooper occupied the front seat with Mr. Bast driving.

Nearing Whitefish, the party stopped at the Oasis, a tavern, located on the main highway about a mile and a half south of Whitefish. There they danced until about 1:30 a. m. when they proceeded to Whitefish where they remained and danced for a quarter of an hour at a tavern called the Palm. At 2 o'clock a. m., when the tavern closed, the party started to return to Kalispell. Again the defendant Bast and Mrs. Cooper occupied the front seat with Mr. Bast at the wheel while Mrs. McQuirk rode in the back seat with Mr. Herman at her right.

On the way to Kalispell, at a place about a mile and a half south of the Oasis, the Herman car met and passed a team of horses hitched to a trailer and shortly thereafter the defendant complained to the other passengers of the brightness of the lights of a car approaching on the highway from the south saying: "That boy is coming pretty fast. I am going to have to take to the ditch." With this remark, the defendant testified that he shifted the car into second gear and drove off the highway and into a shallow depression parallel therewith for a distance of about 268 feet. On leaving the highway the Herman car proceeded first over comparatively smooth ground and then through some low brush which concealed from the view of the driver a hole about two feet in depth containing some large rocks. The evidence is undisputed that but for such hidden hole and rocks the car could have been driven back upon the highway on the route followed by the defendant. Upon going through the brush however the car struck a couple of the rocks which deflected the car from its course causing it to side-swipe a tamarack tree 10 to 12 inches in diameter. The contact with the tree damaged and flattened the right side of the body of the car, sealing the right front door shut so that it could not be opened while the right rear door was wide upon and flopping against the rear fender with the door stops broken, the inside door handle missing and bark from the tree embedded on the inside of the door. Highway Patrolman Morris Blake, called as a witness for the

state, testified that this bark so embedded on the inside of the right rear door led him to conclude that the door must have been open when it hit the tree.

The car did not overturn but came to a stop about six feet from the aforementioned tamarack tree with all four wheels on the ground, with both head lamps burning and with Mr. Bast and Mrs. Cooper sitting in the front seat and Mrs. McQuirk in the back seat. The box of groceries and sacks of flour and feed were still in the back of the car. Mr. Bast stepped out of the car and, on walking around it, he discovered Mr. Herman lying on the ground to the right of the car groaning. After first assisting ·Mrs. Cooper and Mrs. McQuirk out of the car, Mr. Bast turned his attention to Mr. Herman whom he sought to render more comfortable.

The witness J. B. Schnee was the first to arrive on the scene after the accident. He testified that when he drove up there was no one in the Herman car; that Mrs. Cooper and Mrs. McQuirk were both standing to the left of the car; that Mr. Herman was lying on the ground to the right of the car groaning and that Mr. Bast was at his side trying to talk to him. Completing a hasty survey, Mr. Schnee remarked, ''This is an ambulance job,'' and then immediately drove to Kalispell where he ordered an ambulance sent to the place of the accident.

Next on the scene was the witness William Roedel. Mr. Bast requested the witness to lend a hand in lifting Mr. Herman from the ground but the witness declined, saying, ''I have a team standing and have to go.'' Mr. Bast thereupon lifted Mr. Herman from the ground and placed him in the rear seat unassisted, when he inquired of Mr. Herman if he were all right and the latter replied, ''Yes, take care of the girls.''

Mr. Bast then attempted to start the motor of the Herman car but receiving poor response and being unable to move the car on its own power, he set out ''on the double quick'' to summon help. It was about one mile and a half back to the Oasis and Mr. Bast covered this entire distance on foot. On arriving there he was told by the proprietors that William Roedel had

just been in and reported the accident stating that he had trotted his team all the way from the scene. Advising Mr. Bast that they had already reported the accident by telephone to Mr. Blake of the highway patrol at Kalispell, the proprietors then took Mr. Bast in their car and returned him to the scene of the accident.

During Mr. Bast's absence from the scene the witness Schnee returned from Kalispell and shortly thereafter Patrolman Morris Blake arrived. On his return from the Oasis Mr. Bast was informed by Patrolman Blake that Mr. Herman had died. In a few minutes the ambulance arrived and Mr. Bast helped to place Mr. Herman's body therein.

There was no autopsy. No medical testimony was introduced and the record fails to show that the body was at any time examined by any physician or surgeon although the coroner, who is a funeral director and embalmer, over objection, testified that the primary cause of death was hemorrhage and shock.

While Mr. Bast admitted that he had taken a couple of drinks during the course of the evening, yet there is no evidence that he was intoxicated either before or after the accident and the witnesses agree that throughout he appeared exceptionally cool and sober.

The only actual eyewitnesses to the accident were the three surviving occupants of the Herman car who testified that at and prior to the accident, Mr. Bast was driving at a moderate speed, estimated at from 30 to 35 miles an hour. Such eyewitnesses likewise testified that as the Herman car was proceeding along the highway and down a swell therein, they were blinded by the very bright lights of a car approaching on the highway from the south. Two additional witnesses, Altenburgh and Stoffregen, testified that they left the Oasis for Kalispell about 2 o'clock that morning and that about 5 miles south of the place where the accident subsequently occurred they met a northbound car with lights so bright they were blinded, and that Altenburgh, who was driving, had to signal for the approaching car to use its dimmers.

The defendant Bast testified, "I kept tramping on my dimmers and couldn't get any response. I don't think I went over three car lengths before I went down in the ditch, and I didn't tip. I have never tipped over yet by using low gear or second gear to go into a ditch."

The patrolman Morris Blake, a witness for the state, testified that on the morning of the accident he was at his home in Kalispell when at about 2:30 o'clock he received the call reporting the accident; that he thereupon drove to the scene arriving there about 2:50 o'clock and ahead of the ambulance; that there he observed Mrs. Cooper and Mrs. McQuirk who were on the shoulder of the road and Mr. Herman in the back seat of the car on the righthand side and that he did not see the defendant Bast until a little later, the latter having gone to summon help.

The team of horses attached to a trailer which the Herman car met and passed on the highway shortly before the accident was being driven by the witness William Roedel. The team was proceeding in the opposite direction from that in which the Herman car was traveling. The witness Roedel was then sixteen years old. While he did not see the Herman car leave the highway, yet he testified that he heard the noise made by the car as it went through the brush and that when he looked back he saw the car was off the road with its lights burning. Next he observed the car driven by the witness Schnee approaching on the highway from the north but he did not observe any car approaching from the south after meeting the Herman car. The witness Roedel flagged Mr. Schnee down and pointed out the Herman car with the lights burning beside the road. Mr. Schnee testified that it was possibly 350 yards or more or a couple of blocks or more from where the boy stopped him to the Herman car.

Roedel attempted to estimate the miles per hour at which the Herman car was traveling, testifying: "I would *judge* the automobile was traveling from fifty-five to sixty miles an hour."

The accident occurred at a point about 3 miles south of the city of Whitefish. About midway between such point and the

city there is a depression in the highway. The lad testified that before the Herman car reached such depression he only obtained a flash of its lights, which flash lasted but a second; that the lights then became lost to his view as the car entered the depression and that he did not again see the car lights until the car reached the top or crest of the hill which he testified was approximately a mile and a half from where he then was with his team. He further testified that after the Herman car reached the crest of the hill, its lights then remained continuously in his view for about two or three minutes, which time it took for the car to travel from the crest of the hill to the place where it met and passed him. At 30 miles an hour, it would take the car exactly three minutes to travel the mile and a half (7920 feet), being the estimated distance from the crest of the hill to where the car passed the witness Roedel, while at 45 miles an hour it would require two minutes for the car to travel such distance. At the coroner's inquest, Roedel testified that when the Herman car reached the top of the hill it was only about a quarter of a mile ahead of the Schnee car while at the trial he estimated that at such point the cars were about a half mile apart. When requested on cross-examination to explain such variation in his testimony he replied, "Well, one thing, you can't be absolutely positive of your distance at night. Another, you can't time exactly. I never timed it myself between these two cars, I just approximately judged the time. They might have been further than that but it is possible though that the other car wasn't within the speed limit and was exceeding the speed limit, but I couldn't notice it, it hadn't passed me."

When requested to explain how the Herman car could have been traveling at the speed which he testified he "would judge the automobile was traveling" when it required two or three minutes for the Herman car to travel the mile and one half from the crest of the hill to the point where the witness then was he replied: "I am no mathematician. I wouldn't be able to figure that out." The witness then frankly admitted that he must have been mistaken in either his estimate of the

338

speed the car was traveling or in his estimate of the time it took for the car to travel the distance covered, saying it was possible in his estimates to misjudge both the time and the speed.

"In every crime or public offense there must exist a union or ▮ joint operation of act and intent, or criminal negligence." (Sec. 10726, Rev. Codes.) "The intent or intention is manifested by the circumstances connected with the offense, and the sound mind and discretion of the accused." (Sec. 10727, Rev. Codes.)

Clearly the evidence in this case wholly fails to disclose any criminal intent on the part of the defendant Bast. Hence, the theory of the state must be that the accident was caused by the criminal negligence of the defendant in driving decedent's automobile although the information contains no allegations whatever charging the defendant with the commission of any neg- ▮ ligent act or acts. Again it must be remembered that criminal liability cannot be predicated on every careless act performed merely because such carelessness results in injury to another. (*People* v. *Sikes,* 328 Ill. 64, 159 N. E. 293.) The mere happening of an accident, standing alone, is not proof of negligence. (*Baatz* v. *Noble,* 105 Mont. 59, 69 Pac. (2d) 579.)

Here the defendant, at the express request and direction of ▮▮ decedent, was driving decedent's car at the time of the accident. There is no evidence whatever that the decedent or any other person riding in the car at any time complained of the manner in which defendant was driving. The evidence tends to show that of the four occupants the defendant was the best qualified to operate the car on the occasion under consideration and there is a presumption that in so doing he exercised due care. The presumption of due care is founded on the instinct of self-preservation and there is certainly no presumption that the defendant driver intended to commit suicide nor that he was wholly indifferent to his own safety and welfare. (*Huffman* v. *Buckingham Transp. Co.,* 10 Cir., 98 Fed. (2d) 916, 923.)

The state's only testimony to refute that of the three sur-

viving occupants of the Herman car, to the effect that defendant was driving at the moderate rate of speed of between 30 and 35 miles an hour, was that of the boy Roedel and of the highway patrolman Blake who, over objection, testified that from his observation of the road and the car after his arrival on the scene, he was led to *"believe* that a car would have to be traveling close to fifty miles an hour to cover this ground and cause the damage it did to this car."

As before stated, Patrolman Blake did not witness the happening of the accident for at the time it occurred he was at his home in Kalispell some 10 or more miles distant and he certainly did not qualify to testify with any degree of accuracy as to the miles per hour the car was traveling some forty or fifty minutes before he came into the picture. Such guesswork, speculation and conjecture cannot be said to rise to the dignity of evidence on which to sustain a conviction of the serious crime here charged. The burden rested upon the state throughout the case and this burden it failed to meet for we are committed to the doctrine that "a defendant may not be convicted on conjectures, however shrewd, on suspicions, however justified, on probabilities, however strong, but only upon evidence which establishes guilt beyond reasonable doubt; that is, upon proof such as to logically compel the conviction that the charge is true." (*State* v. *Riggs*, 61 Mont. 25, 201 Pac. 272, 280.)

Our Codes provide that a homicide is excusable "When committed by accident or misfortune, in lawfully correcting a child or servant, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent," (sec. 10963, Rev. Codes), and the law of this state expressly exempts from criminal liability and declares incapable of committing crimes "Persons who committed the act or made the omission charged *through misfortune or by accident,* when it appears that there was no evil design, intention, or culpable negligence." (Sec. 10729, Rev. Codes.)

In the record before us we fail to find any evidence whatever of the "evil design, intention, or culpable negligence" essential

to sustain the conviction and it would appear that decedent's untimely death came about "through misfortune or by accident." (Sec. 10729, Rev. Codes.) We think the record presents a case where the defendant's actions throughout were and are entirely consistent with innocence and we find no credible evidence in the case to support the verdict of manslaughter. (See *State* v. *Gunn*, 85 Mont. 553, 281 Pac. 757.)

The judgment is reversed, the verdict of the jury is set aside, and it is ordered that the information be dismissed and the defendant be discharged.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES ANDERSON, MORRIS and ERICKSON concur.