STATE, Respondent, *v.* MESSERLY, Appellant.

No. 9172.

Submitted April 17, 1952. Decided May 29, 1952.

244 Pac. (2d) 1054.

Mr. Jess L. Angstman, Havre, for appellant.

Mr. Arnold H. Olsen, Atty. Gen., Mr. Thomas F. Joyce, Asst. Atty. Gen., Mr. James T. Harrison, County Atty., Malta, for respondent.

Mr. Angstman and Mr. Harrison argued orally.

MR. JUSTICE BOTTOMLY:

Upon an information charging him with the crime of manslaughter, Fred Messerly was found guilty by the jury. The court entered judgment on the verdict. The defendant Fred Messerly appeals from the judgment.

The facts: At Zortman, Phillips County, Montana, on Sunday evening, October 15, 1950, a large number of people had gathered for the opening of the hunting season for deer. A crowd of people were congregated in the Miners Club, also known as the Thompson & Smith Bar. The barroom was some 20 feet long and it was 8 feet from the front of the serving bar to the opposite wall; in the rear of the building was a dance hall, with a door at the rear. A good deal of drinking was going on, with loud and boisterous language. Defendant and his wife were there, and he admitted he had consumed a small amount of beer. About ten o'clock p. m. a fight started between two persons by the names of Swede Sundin and Irvin Flying. Defendant did not think the language was fit for his wife to listen to so he started to take her and go out the front door. The deceased, Peter Doney, a man of 60 years of age, or older, and his wife, Lyda Doney, were sitting on high stools or chairs near the front door along the wall opposite the bar. The stools or chairs had

64

side arms and backs. When the above fight was under way the deceased, Peter Doney, stood up on the foot rest on the stool, or started to stand up to observe the fight, when defendant struck him in the face or head with his fist and knocked him back into the seat of the chair or stool. Defendant hit him two or three times more with his fist in the face or head. The testimony is uncontroverted that Peter Doney never spoke or moved of his own volition after being struck by defendant. He was carried outside by Marleen Kirkaldie and two other persons. They laid him on a bench and an attempt was made to revive him, but to no avail; he never regained consciousness. The deceased had no quarrel or argument with defendant, nor had deceased offered defendant any provocation, and at the time defendant hit him he had made no move in any manner to hit or hit at defendant. Deceased was apparently a bystander. The evidence discloses that the striking of deceased by defendant was at approximately ten o'clock p. m. or shortly thereafter.

Mrs. Lyda Doney testified that neither she nor her husband Peter Doney had drunk any intoxicating liquor that day. The sheriff and Carl W. Bell, a mortician at Malta, were called. Carl W. Bell arrived at Zortman late in the evening of October 15, 1950. The mortician, Bell, testified that he knew Peter Doney in his lifetime; that he took the body of Peter Doney back to his funeral home in Malta, arriving there after midnight. Dr. G. W. Setzer and Dr. W. L. Williams performed an autopsy upon the body of Peter Doney. Dr. G. W. Setzer had known Peter Doney in his lifetime; when he examined the body of Peter Doney in the Bell Mortuary, in Malta, Montana, he was dead.

The defendant's witness, Mrs. Mary Azure, testified to the effect that on October 15, 1950, at five o'clock in the afternoon, some five hours before Peter Doney was struck by defendant, deceased was in the Log Cabin Cafe where she was working; that he was having lunch, a ham sandwich; that he fell backward off the restaurant stool and hit a swinging door that led into the beer parlor; that someone helped him up; that he

finished eating and left the cafe. There is no evidence in the record that deceased hit his head on the door or otherwise. The defendant in his brief lays stress on this evidence and asks the questions: Why the fall from the restaurant stool? Was he drunk at that time? Or did he experience a light stroke? In the event of the former, Mrs. Doney was patently lying; of the latter, did the blow or blows received by him later do the damage which resulted in his death? Or had that damage already been done?

We think the testimony of Dr. G. W. Setzer and Dr. W. L. Williams answers the foregoing questions. Dr. G. W. Setzer testified:

"Q. Now, Doctor, testimony has been introduced in this cause to the effect that some five hours previous to the blow, the inflicting of a blow by the defendant, Peter Doney had fallen from a stool in a restaurant in Zortman, Montana, and struck his head either upon the floor or door, following which he regained his stool, completed eating a sandwich and departed from the restaurant. Now, Doctor, could such a fall have induced the injury which you found in the head of Peter Doney at the time of your autopsy? A. No.

"Q. And why not, Doctor? A. For the simple reason that the findings we found at autopsy indicated that the amount of hemorrhage there was in the brain, that he could have only lived a few minutes."

On cross-examination Dr. Setzer testified:

"Q. Now, Doctor, could that hemorrhage have been caused by a stroke? A. No, for the simple reason our autopsy revealed that where the skull was fractured the middle meningeal artery was also torn in two at that place, and you wouldn't get that type of injury in a stroke; however, a stroke is a ruptured blood vessel without the attending injury.

"Q. You wouldn't want to confine your theory in the Pete Doney case to that injury alone. That might have, along with the excitement, caused what we call a stroke, and between the two it ended him up pretty quick? A. No, there was no indica-

tion of a stroke. Of course all I can testify to is what I found at autopsy. You see, the end arteries are the ones that cause the stroke. This is one of the main arteries that feed the end arteries, and it is very rare, in fact, I have never heard of a case of a man having a stroke from a rupture of the middle meningeal artery itself.

"Q. And that artery was ruptured? A. Yes.

"Q. And the rupture of that artery is associated with the fracture of a skull? A. Yes."

On direct examination Dr. W. T. Williams testified that he observed a bruise on the right side of the face or jaw, and a discolored area on the left side, slightly above and behind the left ear; that they examined the abdominal cavity first and found nothing of significance; they then opened the chest and examined the heart and lungs and found nothing that would suggest a probable cause of death; then they removed the skull cap and found an extensive fracture of the skull on the left side of the head through the portion that is known as the temporal bone; there was much hemorrhage and clotted blood on the inside of the skull, around the area of the fracture and extending down under the base of the brain; quite a large hemorrhage.

"Q. Now, Doctor, upon the blow or injury causing the condition of the interior of the deceased's head, being inflicted, what effect would it have upon the person? A. Well, I would expect that with an injury of that type that he would lose consciousness immediately or very shortly thereafter the time that the injury occurred.

"Q. And approximately how long would life remain in the body, Doctor? A. That would be difficult to say because one does not know how fast the hemorrhage occurred, but it might be a matter of minutes or it might be a matter of a half hour or an hour or so."

On cross-examination Dr. Williams testified:

"Q. Well, Doctor, you have practiced medicine a long time, haven't you? A. Yes, sir.

"Q. And I assume you have seen men who had their heads outwardly injured a great deal more than Pete Doney— A. Yes, that is right.

"Q. Without much more than putting a piece of gauze on that wound, isn't that right? A. That's correct.

"Q. Unless there is a fracture it isn't dangerous? A. That's right.

"Q. Do you think a man, a fellow just in the spur of the moment could strike a blow that would fracture a skull with the fist without leaving some abrasions on his hand? A. Well, I haven't observed too many fists that have struck jaws, but I think that is possible.

"Q. Was this injury on his jaw? A. The injury on the dead man's jaw was insignificant, but in medicine we recognize the fact that sometimes a blow on this side of the head will fracture a skull on the other side of the head, known as contrecoup."

R. C. M. 1947, sec. 94-2507, provides:

"Manslaughter is the unlawful killing of a human being, without malice. It is of two kinds:

"1. Voluntary, upon a sudden quarrel or heat of passion.

"2. Involuntary, in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution or circumspection."

The foregoing statutory provisions are a recognition of the frailty of human nature, the purpose of which is to reduce a homicide committed under the circumstances therein contemplated to the grade of manslaughter, either voluntary or involuntary, as the facts may warrant. From the statute above quoted it appears that the unlawful killing of a human being, without malice and deliberation, upon a sudden quarrel or heat of passion, caused by a provocation sufficient to excite an irresistible passion in a reasonable person constitutes manslaughter, and that involuntary manslaughter may consist in the taking of a human life without any intent so to do in the commission of an unlawful act, not amounting to a felony, or in the com-

mission of a lawful act in an unlawful manner or without due caution or circumspection.

The defendant asserts that the evidence fails to disclose any ██ criminal intent on the part of the defendant, but criminal intent is not an element in involuntary manslaughter. It is manifest there was testimony tending to prove manslaughter. Whether or not it was sufficient to justify a verdict of that character was for the jury to determine, and not the courts.

Defendant assigns as error the court's refusal of his motion for a directed verdict of not guilty. Considering the evidence in the record, we think the trial judge was right in refusing to grant the motion.

Defendant also assigns as error the entering of the judgment by the court, against the defendant, for the reason that there is no substantial evidence in the case to support a judgment of conviction. In support of this contention, defendant especially criticizes the testimony of state's witness Marleen Kirkaldie, an 18-year old girl. While her testimony in some particulars was somewhat confused and contradictory, yet the facts to which she was testifying had transpired over a year before, and it should be noted that she was an unwilling witness for the state. She testified that she would not want to say anything on the witness stand that would hurt the defendant. She was a first cousin of the defendant. It was necessary for the county attorney to refresh the memory of the witness Marleen Kirkaldie by means of the record of her testimony given at the coroner's inquest held in October 1950. This witness testified that the defendant struck the deceased Peter Doney and Doney fell back in his chair; that defendant hit him on the head and face about three times; that Mrs. Lyda Doney kept trying to protect her husband Pete Doney and telling defendant not to hit him; she put her hands over his face to protect him. Mrs. Lyda Doney corroborated this testimony.

Under all the evidence in this case the jury was warranted in ██ believing that the defendant struck the deceased without any provocation; that deceased never moved again of his own

volition; that death resulted from the blow or blows within a very short time after the blow or blows were struck; that the death of defendant was the result thereof.

It is for the jury and not the reviewing court to determine the credibility of a witness and the weight to be given to his testimony. Compare: State v. Robinson, 109 Mont. 322, 96 Pac. (2d) 265; State v. Espelin, 106 Mont. 231, 76 Pac. (2d) 629; State v. Collett, 118 Mont. 473, 480, 167 Pac. (2d) 584.

The testimony of the witness Marleen Kirkaldie was not so improbable as to be disregarded by the court and jury. Conflicting evidence, as to whether witness was in a position to see the things she testified about, were questions for the jury. Compare State v. Allison, 122 Mont. 120, 199 Pac. (2d) 279. The same may be said of the testimony of Lyda Doney, the wife of the deceased, as well as the other witnesses in the case.

Disputed questions of fact and the credibility of witnesses will not be considered on appeal. Determination of such matters is within the province of the jury, and so long as there is substantial evidence to support the verdict, it cannot be disturbed on appeal. Compare: State v. Howell, 26 Mont. 3, 66 Pac. 291; State v. Dougherty, 71 Mont. 265, 229 Pac. 735. There was sufficient competent evidence, if believed by the jury, to justify the jury's verdict.

A discussion of each of the instructions given over defendant's objection, and of each of defendant's instructions refused, would unduly extend this opinion. We have examined all of the instructions given and we are of the opinion that the jury was fully and fairly instructed as to the law applicable to this case. The instructions refused were either covered by given instructions or were not applicable. When instructions as a whole correctly state the law, error does not exist.

We find no prejudicial error in the instructions given. The jury's verdict is sustained. Judgment affirmed.

MR. CHIEF JUSTICE ADAIR, and ASSOCIATE JUSTICES METCALF, FREEBOURN, and ANGSTMAN, concur.