STATE OF MONTANA, PLAINTIFF AND RESPONDENT, *v.* FRANCES STROBEL, DEFENDANT AND APPELLANT.

No. 9540.

Submitted June 19, 1956. Decided December 7, 1956.

Rehearing denied December 27, 1956.

304 Pac. (2d) 606.

444

Mr. E. O. Overland, Big Timber, Messrs. Rankin & Acher, Helena, for appellant.

Mr. Arnold H. Olsen, Atty. Gen., Mr. O. J. Paulson, County Atty., Big Timber, Mr. J. J. McCaffery, Jr., Special Asst. Atty. Gen., for respondent.

Mr. Arthur P. Acher, Mr. W. D. Rankin and Mr. McCaffery argued orally.

HONORABLE E. F. FENTON, District Judge.

The appellant, Frances Strobel, was convicted of the crime of manslaughter upon an information, filed June 2, 1954, charging that on or about October 25, 1953, she did wilfully, and feloniously kill one Gerald Little. The appeal is from

the judgment and from the order of the district court denying a new trial.

Gerald Little came to his death upon U. S. Highway No. 10, approximately four miles east of Big Timber, Montana, while driving an oil truck carrying 3,800 gallons of ethyl gasoline in the tank mounted on the truck and 4,000 gallons of regular gasoline in the attached tank trailer. Following a collision between the truck and an automobile driven by the defendant, the truck overturned upon the highway and the gasoline exploded into flames. Mr. Little's body was not recovered until after the fire had burned itself out, when the truck was pulled upright, and his body was found in the cab. His death occurred on the evening of October 25, 1953; his wrist watch, with the crystal burned off had stopped at the hour of 10:10 p.m. There were no eye witnesses to the accident other than the defendant who was driving alone in her car, traveling east, and Herman Wegner, who, also driving eastward, was a short distance in front of the defendant's car when he observed the explosion in his rear view mirror.

The defendant's motion for a new trial was made upon the ground, among others, of insufficiency of the evidence. By the evidence two controlling issues were submitted to the jury: (1) Criminal negligence in unlawfully driving while under the influence of intoxicating liquor; (2) Criminal negligence in unlawfully driving to the left of the center line of the highway.

With respect to the first of these issues the defendant contends that there was no substantial evidence that she was under the influence of intoxicating liquor. To the contrary it is argued by the State that the intoxication of the defendant was established by evidence relating to her condition while in a bar a short time before the collision, her erratic control of the car driven by her upon the highway and her conduct after the collision.

The only testimony offered by the State to show intoxication preceding the collision was that of one witness, Jim B. Goosey twenty-two years of age, who stated that he was in the Cort

Bar at Big Timber for a period which he estimated at not over three to five minutes; that he there saw the defendant, with whom he was well acquainted, seated at the bar between two men who were unknown to the witness, with an amber colored drink before her, from which she took a drink; that the witness spoke to her and that she looked at him but did not reply to his greeting; that he then leaned over the bar in front of her and asked the bartender if he had seen a man named Jack for whom the witness was searching. On being informed by the bartender that Jack had been in but had left, the witness turned around and walked out. When asked to describe the defendant's condition Mr. Goosey said: "Well, I have been around quite a few drunk people and my impression was that Frannie [the defendant] was drunk." Asked how he arrived at that impression he answered: "Well, she sat rather slouched in the chair and her eyes kind of half open; and, well I don't know, the way you tell anybody is drunk, I guess." He further stated that the defendant did not look unkempt but was tidy. Answering a question as to the defendant's appearance he said: "Well, her appearance was, I would say the sleepy appearance that most people have when they are drunk." The witness stated that the defendant was engaged in conversation with the men seated beside her, but that he did not recall hearing any of the conversation.

"It is generally held that witnesses may express their opinion on the question of intoxication without qualifying as experts on the subject, and that such opinions are not conclusions which the ordinary witness is not entitled to draw from his own observation. These matters are of common knowledge and observation." Meinecke v. Intermountain Trans. Co., 101 Mont. 315, 322, 55 Pac. (2d) 680, 681. This rule logically requires, however, that the witness who from his own observation forms an opinion on the question of intoxication must have had a suitable opportunity for observation. 20 Am. Jur., Evidence, section 876, page 737; 32 C.J.S., Evidence, section 508, page 183. During a part of the brief period of from three to

five minutes covered by the testimony of the witness he was engaged in conversation with the bartender; the defendant did not speak to the witness; he had no opportunity to observe her manner of walking since she was seated during all of the time he was in the bar; none of the usual manifestations of intoxication, such as slurred or thick speech, unsteadiness or staggering, or the smell of liquor on the breath, was mentioned by this witness.

Anton Tweeden, a witness for the defendant, testified he was tending bar on the date of the accident in question; that the defendant was in the bar from five to fifteen minutes, between 9:30 and 10:00 p.m., inquiring for her husband; that she drank no liquor but was served a bottle of pop; that he would say she was sober and showed no signs of drinking. His testimony was impeached in part by a written statement previously signed by him, in which he had stated the defendant was in the bar in the afternoon about suppertime and had a bottle of pop, which written statement further recited that the witness did know what condition she was in as to being drunk or sober.

Concerning the defendant's control of her car, Herman Wegner, a witness for the State testified that immediately before the accident, while driving on the highway east of Big Timber, he observed a car following which caught up with him, and that "as it caught up with me, it several times, once, two or three times, tried to pass. It pulled out in the left-hand side of the road and attempted to pass, and each time it would fall back." Mr. Wegner testified that the car behind him was following at a distance of approximately fifty feet from him when he observed there were no headlights showing in his rear view mirror and that he then saw an explosion behind him. Immediately before this explosion, Mr. Wegner had met the truck which was involved in the collision. He was driving a 1941 model automobile at a speed of about forty-five miles per hour. No other evidence was introduced by the State concerning the defendant's control of her car or the speed or manner of her driving. Mr. Wegner's testimony in this respect, while in-

dicating that defendant was driving on the left side of the highway, had no relevant tendency to prove whether the defendant was or was not under the influence of intoxicating liquor.

A considerable number of witnesses had occasion to observe the defendant immediately after the accident. Only one of them, Paul Westervelt, a witness for the State, indicated any opinion or inference that the defendant was under the influence of intoxicating liquor. Mr. Westervelt saw the defendant being laid on the ground by two persons, which circumstance was also included in the testimony of the witness Herman Wegner, who stated that shortly after the collision he opened the door of defendant's car and two men who were unknown to him carried her a safe distance from the fire and laid her by the roadside. Mr. Westervelt stated he was about five feet from the point where the defendant was lying, that she was doing "quite a lot of talking" and that the substance of her talking was "mostly profanity". Asked whether, from observing her and her use of language, he came to any conclusion as to her condition, he answered, "I would assume that she was pretty drunk or out of her head."

It appears from the testimony of E. F. Osterhout that the defendant must have been carried some fifty or sixty feet, since he stated he saw her lying at about that distance from her car.

Dr. L. W. Baskett, a witness for the defendant, testified that her pelvis was fractured in two places, one hip was dislocated, a rib fractured, and that she had numerous cuts, bruises and abrasions all over her body. Under these circumstances the defendant's use of profanity when carried some fifty or sixty feet could not be characterized as evidence tending to prove she was under the influence of liquor. Without other evidence, the fact that the defendant used profane language is insufficient to show she was under the influence of intoxicating liquor. Kennedy v. State, 76 Okl. Cr. 256, 137 Pac. (2d) 244.

Dr. Baskett, the defendant's family physician, attended her

at the scene of the accident and thereafter at a hospital. He stated that when he first saw her lying on the ground she was semi-conscious; that he smelled no liquor on her; that he did not see any appearance of intoxication. Asked whether he had any reason to believe she was intoxicated at that time, he stated that he did not. The defendant was admitted to the hospital at 11:15 p.m. and Dr. Baskett stated that at some time after 2:00 a.m., after he had gone to bed, he was called and told that the highway patrolman wanted a blood test, to which the doctor responded, "he was not going back over there after that length of time and wake her up and disturb her." In further explanation he stated, "we had her quieted down and I did not want to disturb her." Asked by counsel for the State whether, as the defendant's family physician, it would not have been better judgment to have taken the blood test if he had no reason to believe she was intoxicated, the doctor answered, "Well, I had no occasion to take it; no reason for taking it."

Max Officer, a ranch foreman, forty-six years of age, saw the burning truck from his nearby home, and with Charles Behney went to the scene of the accident. The defendant, whom the witness had known for some twenty years, was then lying on the ground. Mr. Officer testified that he leaned down very close to he because her voice was low; that he had to get within a foot of her to hear her voice; that "there was no odor of liquor at all"; and that she showed no evidence whatever of intoxication. Mr. Behney stated neither he nor Mr. Officer had any intoxicating liquor that evening, and that he detected no liquor about the defendant, but it appeared from his testimony he was not closer than four or five feet from her.

Arden Berg, age twenty, testified he went to the scene of the accident with his brother, Jack Berg, and Pat Pederson; that he knelt down to talk to the defendant, whose voice was faint; that "her feet were cold and she was wanting them adjusted * * and you couldn't move her legs any, it would hurt her." He stated that his face was as close as approximately six inches

from the face of the defendant; that he detected no odor of alcohol whatever from her breath; and that he himself had not been drinking that evening.

E. M. (Pat) Pederson testified to the same facts as those stated by Arden Berg; that defendant's voice was low and that he knelt beside her; that "She had not been drinking," and there was no odor of liquor whatsoever about her person, her face or her breath.

Jack Berg, a sixteen year old high school boy, corroborated the testimony of the two last-mentioned witnesses. He testified he sat beside the defendant for about twenty minutes before the ambulance arrived; that he wiped blood off her face; that he had to get within about a foot of the defendant to hear her; that he did not detect any odor of alcohol about her or from her breath and that she was sober.

Cecil Valgamore, a long-time resident of Sweet Grass County, went to the scene of the accident with Dean Lowry, owner of a mortuary and ambulance service, leaving his home at about 10:20 p.m. He testified that because of the long splint placed on defendant's leg she was placed high on the ambulance cot and for this reason he knelt beside her and held her head up during the drive to the hospital; that at times his face was only about two inches from that of the defendant; that he could see no signs of intoxication, and that he smelled no odor of liquor about her at any time. However, a Mr. Ben Berg rendered assistance and accompanied them in the ambulance and that the witness stated that at times during the trip he smelled the odor of liquor emanating from Mr. Berg.

Mr. Lowry, the coroner, was a witness for the State. His testimony was that he detected the odor of liquor while transporting the defendant to the hospital; that as far as he could tell this odor was solely from Mr. Berg; and that he obtained no odor of liquor from the defendant.

The defendant related in some detail her whereabouts during the afternoon and evening of the day in question. Her testimony was to the effect she had spent the afternoon in Big Tim-

ber with her four children, had seen the witness Anton Tweeden in the bar about suppertime, had taken her children to the ranch home about 7:00 p.m., had there done some housework, and then returned to Big Timber to look for husband, and was again in the same bar between 9:30 and 10:00 p.m., and that at no time on that day had she had a drink of intoxicating liquor.

The testimony relating to the issue of the defendant's intoxi- [2] has been outlined at length and in detail for the reason that "It is the well settled rule of this court that the verdict will not be disturbed or supported by substantial evidence." State v. Curtiss, 114 Mont. 232, 135 Pac. (2d) 361, 362.

Upon a full consideration of the entire record we are com- [3] to conclude there was no substantial evidence that the defendant was under the influence of intoxicating liquor.

The defendant assigns error in the giving of Instruction No. ██ ██ 6, setting forth a copy of the statute, R.C.M. 1947, section 31-108, subd. 40, prohibiting driving while under the influence of intoxicating liquor and going on to define the meaning of the phrase, "under the influence of intoxicating liquor." It is here urged that this instruction should not have been given for the reason that it related to an issue of fact not supported by any substantial evidence and, hence, there was no foundation in the evidence for the instruction. However, the validity of this assignment must be denied since the only objection made in the lower court was that it invaded the province of the jury by attempting to define "influence of intoxicating liquor", and that the instruction should be confined to the terms of the statute without supplemental definition. On appeal in a criminal case the only objections to instructions which may be considered are those made at the time the instructions were settled. State v. McComas, 85 Mont. 428, 278 Pac. 993. "In the absence of proper objections, this court is powerless to reverse the judgment for alleged error in the giving of instructions." State v. Neidamier, 98 Mont. 124, 130, 37 Pac. (2d) 670, 673.

Nevertheless, the absence of any appropriate objection to the ██ instructions does not preclude reliance upon the insuf-

ficiency of the evidence as a ground for new trial. State v. Gunn, 85 Mont. 553, 281 Pac. 757; State v. Cates, 97 Mont. 173, 202, 33 Pac. (2d) 578.

Irrespective of the insufficiency of the evidence relating to the issue of driving while under the influence of intoxicating liquor, the State contends that the second issue submitted to the jury, viz., criminal negligence in unlawfully driving to the left of the center line of the highway, was supported by substantial evidence, and warranted the conviction of the defendant.

Upon this issue a state highway patrolman, Paul Deyerle, testified without objection that the physical facts found at the scene of the accident showed the point of collision to be three feet four inches north of the center line of the highway. To the contrary the defendant testified she was driving on her own side of the highway, that the truck came across directly in the path of her car, "and there was a crash."

The evidence showed without dispute that the front wheels of the truck driven by Mr. Little were not equipped with brakes, and that the tire or skid marks found on the highway were necessarily made by the dual driving wheels to which the air brakes were connected. The skid or tire marks were ninety-four feet in length. At the point of beginning the skid mark made by the left wheels of the truck was two feet and five inches to the north of the center line of the highway. It continued on that side of the centerline the greater part of the distance of ninety-four feet, but immediately before the point of termination this skid mark swerved to the left, crossed over the center line, and terminated immediately south of that line.

It further appears from the evidence that the distance from the dual driving wheels to the front bumper of the truck was between eighteen and twenty feet. The defendant earnestly contends that these facts demonstrate that the front part of the truck, extending at an angle across the south half of the highway for eighteen or twenty feet beyond the point of termination of the skid marks left by the dual wheels behind the cab of the truck, would necessarily block the southerly lane of traf-

fic wherein the defendant testified that she was driving. However, since the greater part of the ninety-four foot skid marks left by the dual wheels was parallel with and on the north side of the centerline, and since the testimony of the highway patrolman fixed the point of impact as three feet and four inches on the north of the centerline, the jury might have disbelieved the testimony of the defendant and concluded that she was driving to the north of the centerline instead of in her own lane of traffic, and that in this emergecy Mr. Little first applied his brakes and then turned the truck to the left and across the centerline in a last minute attempt to avoid the collision. Further, the evidence of Mr. Wegner, hereinbefore summarized, indicated that the defendant was driving in the left lane of traffic in the path of the oncoming oil truck. There is no evidence in the record indicating that the defendant's view ahead was obscured in any manner.

The jury evidently rejected the testimony of the defendant and accepted the evidence offered by the State. This it had a right to do. State v. Willette, 46 Mont. 326, 127 Pac. 1013; State v. Grimsley, 96 Mont. 327, 30 Pac. (2d) 85; State v. Semmens, 105 Mont. 113, 71 Pac. (2d) 913.

Other testimony on behalf of the defendant which is urged in appellant's brief as warranting a reversal of the judgment created sharp conflicts in the evidence, all of which were by the verdict resolved against the defendant. "Disputed questions of fact and the credibility of witnesses will not be considered on appeal. Determination of such matters is within the province of the jury, and so long as there is substantial evidence to support the verdict, it cannot be disturbed on appeal." State v. Messerly, 126 Mont. 62, 69, 244 Pac. (2d) 1054, 1057. See also, State v. Robinson, 109 Mont. 322, 96 Pac. (2d) 265; State v. Harkins, 85 Mont. 585, 281 Pac. 551, and cases therein cited.

Notwithstanding the insufficiency of the evidence with respect to the defendant's intoxication, there was sufficient competent evidence upon which to submit to the jury the is-

sue of the defendant's criminal negligence in driving to the left of the centerline of the highway. That issue was for the jury, as the trier of the facts, to decide. "Whether or not it is criminal negligence to drive an automobile in such a manner that all or part of it extends over the center line of a highway must necessarily depend upon all of the surrounding circumstances." State v. Riddle, 112 Utah 356, 188 Pac. (2d) 449, 453.

However, the element of criminal negligence was not included in the one instruction given to the jury relating to driving to the left of the center line of the highway. That instruction was as follows:

"Instruction No. 7. You are instructed that if you find, beyond a reasonable doubt, that Frances Strobel was driving on the wrong side of the road, in violation of the statutes, and that by reason of her driving unlawfully on the wrong side of the road, she struck the gasoline truck, causing the death of Gerald Little, and you find beyond a reasonable doubt that the swerving of the truck was not a contributing cause of the collision, and you further find beyond a reasonable doubt that Gerald Little had in no way contributed to the cause of the collision, but that he was driving on his own side of the road and turned to the wrong side only for the purpose of avoiding said Frances Strobel, then you may find the defendant guilty."

By this instruction the jury was advised that the violation of statutes relating to driving on the wrong side of the road, if such violation resulted in the collision which caused the death of Gerald Little, was a basis sufficient for finding the defendant guilty of manslaughter, provided that Mr. Little did not contribute to the cause of the collision. To this instruction the defendant objected upon the ground that it amounted to a peremptory charge that the defendant might be found guilty if she drove on the wrong side of the road, irrespective of the circumstances which might have caused her so to do.

While not objected to upon that ground, it may be observed that this instruction appears erroneous in submitting questions of law to the jury, contrary to the rule that such

questions are not within the province of the jury. R.C.M. 1947, section 94-7236; People v. Albertson, 23 Cal. (2d) 550, 145 Pac. (2d) 7, 26; People v. Thomas, 25 Cal. (2d) 880, 156 Pac. (2d) 7, 15.

It should also be observed that the statutes then in force (which statutes have now been repealed by chapter 263, Laws of 1955) necessitated interpretation, since R.C.M. 1947, section 32-1102, requires, without exception, that "traffic must everywhere and at all times keep to the right," while it is provided by R.C.M. 1947, section 32-1104, that "when vehicles meet, the driver of each must turn reasonably to the right of the center of the highway or road, so as to pass without interference," and it is further provided by R.C.M. 1947, section 31-108, subd. 19, that a crime is committed by one "failing to drive to the right of the center line or passing a motor or other vehicle." The last cited statute further provides that "passing is allowed only where the driver overtaking another vehicle can see sufficient clear road to pass and return to his side of the road before endangering an approaching vehicle coming in the opposite direction."

While Instruction No. 5 contained a verbatim copy of R.C.M. 1947, section 32-1101, "Speed Regulations", containing the basic rule then in effect, and while Instruction No. 6 set forth a copy of R.C.M. 1947, section 31-108, subd. 40, relating to driving the duty to drive to the right of the center line and the extion was given setting forth any statute or rule of law respecting the duty to drive to the right of the centerline and the exceptions thereto; and this notwithstanding that Instruction No. 7, hereinbefore set forth, required the jury to determine whether the defendant "was driving on the wrong side of the road in violation of the statute."

The definition of involuntary manslaughter set forth in R. C.M. 1947, section 94-2507, was included in the following instruction:

"Involuntary manslaughter is the unlawful killing of a human being with malice and is defined by statute as: 'Involun-

tary, in the commission of an unlawful act, not amounting to felony, or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution or circumspection.' ''

Instruction No. 7, submitting the question of driving on the wrong side of the road in violation of the statutes, was apparently intended to present to the jury the issue of defendant's guilt in the unlawful killing of a human being "in the commission of an unlawful act, not amounting to felony."

It was noted in State v. Darchuck, 117 Mont. 15, 18, 156 Pac. (2d) 173, 174, that "Some courts hold that the words 'unlawful act' as used in the statute have application only to acts *malum in se* and not those merely *malum prohibitum* * * *.

"We need not in this case determine whether we would restrict our statute to the doing of unlawful acts *malum in se.* That question must be determined when we have a case before us involving an act merely *malum prohibitum.*"

The driving of an automobile to the left of the centerline of the highway appears to be an act merely *malum prohibitum.* Gutierrez v. State, 125 Tex. Cr. R. 283, 68 S.W. (2d) 198. Since this infraction of the law of the road is the only basis upon which the judgment of conviction can be sustained, it would seem that we are now confronted with the necessity of deciding the question outlined in the language last above quoted from State v. Darchuck.

A considerable number of cases will be found in the reports wherein courts have endeavored to determine criminal responsibility through the application of the distinction between acts *malum in se* and acts merely *malum prohibitum.* See cases cited in State v. Darchuck, supra; State v. Lingman, 97 Utah, 180, 91 Pac. (2d) 457, 465; People v. Mitchell, 27 Cal. (2d) 678, 166 Pac. (2d) 10, and in notes to 29 C.J., Homicide, section 139, page 1153; 40 C.J.S., Homicide, section 60, page 923; 26 Am. Jur., Homicide, section 193, page 285. In the last cited authority it is said the rule that an unintentional homicide is a criminal offense where occasioned by a person engaged, at

the time, in an unlawful act is "subject to the important qualification that if the act in question is not inherently dangerous and there is no negligence in its performance, there is no criminal liability unless the act was *malum in se* and not merely *malum prohibitum,* although some courts do not observe this distinction."

In some jurisdictions it is held that when one commits an act expressly prohibited by law which results in the death of a human being he is thereby guilty of manslaughter and that in such a case an instruction on criminal negligence is neither necessary nor proper. State v. Deane, 75 Idaho 149, 268 Pac. (2d) 1114, 1116; State v. Salhus, 68 Idaho 75, 189 Pac. (2d) 372, and cases therein cited.

The rule illustrated by the above-cited Idaho cases has not been followed in Montana.

(1) In State v. Darchuck, supra, in which the prosecution for involuntary manslaughter was based upon "the commission of an unlawful act, not amounting to felony,' " the giving of instructions on criminal negligence was inferentially approved. The unlawful act in that case was the driving of an automobile on a public highway while in an intoxicated condition.

(2) In State v. Souhrada, 122 Mont. 377, 386, 204 Pac. (2d) 792, 797, a case in which the evidence showed that the defendant was driving while intoxicated, the defendant objected to the giving of an instruction advising the jury that intent is not an element of involuntary manslaughter. This court said: "The giving of such instruction did not constitute error, for, in this prosecution for involuntary manslaughter, *the issue is one of criminal negligence rather than of intent."* (Emphasis supplied.)

(3) In State v. Bosch, 125 Mont. 566, 242 Pac. (2d) 477, 480, the charge of involuntary manslaughter was supported by evidence that the defendant was driving while in an intoxicated condition, that he was driving at an unlawful rate of speed, and that he attempted to pass another vehicle when unable to see a sufficient clear road to allow him to pass and

458

return to his side of the road without endangering an approaching vehicle. The giving of instructions on criminal negligence was approved and it was held that those instructions cured an objectionable instruction which advised the jury that the commission of an unlawful act, not amounting to felony, if it proximately caused the death in question, was a basis sufficient for a verdict finding the defendant guilty. In the last cited case the lower court further gave an instruction to the effect that certain specified traffic violations, six in number were unlawful, and this instruction concluded with the statement, " 'that the commission of an unlawful act, not amounting to felony, constitutes criminal negligence.' " Upon appeal this court qualified that instruction by holding that "not every violation of the law of the road amounts to criminal negligence is reckless, wanton and of such character as shows an utter disregard for the safety of others."

This court has thus committed itself· to the rule that the ▆▆▆ killing of a human being, "in the commission of an unlawful act, not amounting to felony," does not constitute involuntary manslaughter unless the element of criminal negligence is also present.

It may be noted, too, that the same requirement of criminal ▆▆▆ negligence is imposed with respect to the unlawful killing of a human being " 'in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution or circumspection.' " State v. Powell, 114 Mont. 571, 138 Pac. (2d) 949, 950.

In State v. Messerly, 126 Mont. 62, 66, 244 Pac. (2d) 1054, ▆▆▆ it is held that criminal intent is not an element in involuntary manslaughter. It is stated in 26 Am. Jur., Homicide, section 18, page 166, that, "The mental state that characterizes the crime of involuntary manslaughter is the absence of intention to cause death, either actual or reasonably to be implied from the homicidal act." See also, 40 C.J.S., Homicide, section 56. In the absence of criminal intent as an element of the crime, the element of criminal negligence must be present, for, as

pointed out in State v. Bast, 116 Mont. 329, 151 Pac. (2d) 1009, 1012, " 'In every crime or public offense there must exist a union or joint operation of act and intent, or criminal negligence.' Sec. 10726, Rev. Codes [1935, R.C.M. 1947, section 94-117]."

In the case at bar the information charged that the defendant did "wilfully, unlawfully and feloniously kill one Gerald Little." It is said in State v. Souhrada, supra, that, "this court previously has indicated that 'feloniously' implies an act which is done with a mind bent on doing wrong. State v. Rechnitz, 20 Mont. 488, 52 Pac. 264."

In Morissette v. United States, 342 U.S. 246, 72 S. Ct. 240, 244, 96 L. Ed. 288, after citing Blackstone's sweeping statement that to constitute any crime there must first be a "vicious will", the court goes on to observe that "crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand," and went on to say that the unanimity with which courts have adhered "to the central thought that wrongdoing must be conscious to be criminal is emphasized by the variety, disparity and confusion of their definitions of the requisite but elusive mental element."

In State v. Custer, 129 Kan. 381, 282 Pac. 1071, 1075, 67 A.L.R. 909, the common law on the matter was exhaustively reviewed, and the conclusion was stated that "it came to be thoroughly understood that the system of thought known as the common law did not sanction conviction of a man of manslaughter resulting from negligent conduct, unless his conduct was accompanied by a wrong mental attitude having the qualities of recklessness." The court went on to say:

"Possibly Blackstone's 'vicious will,' which he said was essential to every crime, meant substantially 'intention.' It may be conceded that Lord Abinger's statement, 'it is a maxim older than the law of England that no man is guilty unless his mind is guilty (Regina v. Allday, 8 C. & P. 136), may, as Sir James Stephen said, look more instructive than it really is (2 Stephen, History Criminal Law, 95); and that there is a certain vague-

ness and variableness about the psychological element of crime called '*mens rea*'."

Irrespective of this vagueness and variableness, it is never- basically true that "The legal and moral traditions of the western world require that those who, of their own free will *and with evil intent* (sometimes called *mens rea*) commit acts which violate the law, shall be criminally responsible for those acts." Durham v. United States, 94 U.S. App. D.C. 228, 214 F. (2d) 862, 876, 45 A.L.R. (2d) 1430. (Emphasis supplied.)

It would seem apparent that the crime of involuntary manslaughter "in the commission of an unlawful act, not amounting to felony" must necessarily include the mental element of *mens rea* if the act so committed is *malum in se* and not merely *malum prohibitum*. See Keller v. State, 155 Tenn. 633, 299 S.W. 803, 59 A.L.R. 685.

To the contrary, however, a reference in State v. Wojahn, 204 Or. 84, 282 Pac. (2d) 675, 700, to an article in 24 Ind. L.J. 89, on the subject of *mens rea*, "discloses the difficulty which confronts anyone who attempts to devise a formula which will segregate the type of crimes in which *mens rea* is a required element from those in which it is not. In efforts to make the segregation, the distinction between crimes *mala in se* and *mala prohibita*, according to the author, is not helpful."

We adopt the following observation made by the United States Supreme Court in the Morissette case, supra: " 'Neither this Court nor, so far as we are aware, any other has undertaken to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not. We attempt no closed definition, for the law on the subject is neither settled nor static.' "

Commenting on the last-quoted language, the Supreme Court of Oregon, in State v. Wojahn, supra, stated that the inference may be warranted that "generally, the traditional crimes which are deemed infamous and which have always included *mens rea* as an element, require proof of culpability even when

the crime is placed in statutory form by an enactment which is silent upon the subject.''

Supporting the statement hereinbefore quoted from State v. Custer, supra, that manslaughter is one of the traditional crimes in which the element of *mens rea* is essential, Rev v. Bateman (1925), 94 L.J.K.B. (n.s.) (Eng.) 791-CA, is cited in the Annotation in 161 A.L.R. pages 15-16. Homicide through Culpable Negligence. In that case the distinction between civil and criminal liability for death by negligence was expressed as follows:

''If A has caused the death of B by alleged negligence, then, in order to establish civil liability, the plaintiff must prove (in addition to pecuniary loss caused by the death) that A owed a duty to B to take care, that that duty was not discharged, and that such default caused the death of B. To convict A of manslaughter, the prosecution must prove the three things above mentioned and *must satisfy the jury, in addition, that A's negligence amounted to a crime.* In the civil action, if it is true that A fell short of the standard of reasonable care required by law, it matters not how far he fell short of that standard. The extent of his liability depends not on the degree of negligence, but on the amount of damage done. In the criminal court, on the contrary, *the amount and degree of negligence are the determining questions. There must be mens rea.*'' (Emphasis supplied.)

Insofar as the offense of involuntary manslaughter is con- the proof of culpability is supplied by evidence of criminal negligence. In People v. Roby, 52 Mich. 577, 18 N.W. 365, 50 Am. Rep. 270, Justice Cooley said:

''I agree that as a rule there can be no crime without a criminal intent, but this is not by any means a universal rule. One may be guilty of the high crime of manslaughter when his only fault is gross negligence, and there are many other cases where mere neglect may be highly criminal.''

In State v. Catellier, 63 Wyo. 123, 179 Pac. (2d) 203, 220, it is noted:

''Criminal negligence is itself, of course, an unlawful act.

462

The cases are not uniform as to what unlawful act *aside from such criminal negligence* makes a person guilty of manslaughter, should death ensue. In many, if not most instances courts have refused to interpret the term 'unlawful act' literally, and have made an additional requirement, as, for instance, that the unlawful act must be *malum in se*. See 40 C.J.S., Homicide, sections 57-60, pages 920-924; 26 Am. Jur., pages 285-286; 87 University of Pa. Law Review, 828.'' (Emphasis supplied.)

Because of the requirement that in every crime there must be a joint operation of act and intent or of act and criminal negligence, the decisions of this court have declared that criminal negligence is an essential element of the crime of involuntary manslaughter. It is not incumbent upon us to go further and determine the character of the unlawful act, *aside from such criminal negligence,* which makes a person guilty of manslaughter should death ensue. Irrespective of the character of the unlawful act, whether *malum in se* or merely *malum prohibitum,* the criminality of the act resulting in death is established if that act resulting in death is established if that act act was done negligently in such a manner as to evince a disregard for human life or an indifference to consequences. Negligence of this character is culpable in itself. Hence it is wholly unnecessary in involuntary manslaughter cases to superimpose upon the requirement of the element of criminal negligence the further requirement that a determination must be made as to whether the act resulting in death might ordinarily be classified as *malum in se* or merely *malum prohibitum* for, if that act is done in a manner which is criminally negligent, it thereby becomes *malum in se* and thereby includes the element of *mens rea.*

We therefore adopt the following statement to be found in State v. Lingman, 97 Utah 180, 91 Pac. (2d) 457, 466:

''We think the 'unlawful act', that is, the infraction, must be done in such a manner as to more than constitute a mere thoughtless ommission or slight deviation from the norm of prudent conduct. It must be reckless or in marked disregard

for the safety of others. When it does that, it passes the stage of mere malum prohibitum and approaches the unsocial aspects of malum in se. And the spirit of the person while committing the infraction is not a test. A truck driver seriously bent on meeting a schedule of his rounds who shoots through an intersection as if he were driving the only car extant, is just as guilty of reckless conduct as the driver of a car full of revelers joyously celebrating a football victory.''

It may be observed that in the recent case of People v. Penny, 44 Cal. (2d) 861, 285 Pac. (2d) 926, 932, it was stated:

''* * * the law in California as to what constitutes 'criminal negligence' or a lack of 'due caution and circumspection' is confused.''

In resolving this confusion the court reviewed the decisions under the California Negligent Homicide Statute as well as in cases of involuntary manslaughter. It was pointed out that ''* * * at present, different standards are set forth [in the statutes] for deaths caused through the operation of a vehicle and deaths otherwise caused.'' Following its resume of former decisions the court said:

So far as the latest cases are concerned, it appears that mere negligence is sufficient to constitute a lack of due caution and circumspection under the manslaughter statute, Pen. Code, section 192, subd. 2. This does not appear to be a correct rule. Something more, in our opinion, is needed to constitute the criminal negligence required for a conviction of manslaughter.''

After thus overruling its former decisions, the California court adopted as the correct rule the same statement which was quoted with approval from 26 Am. Jur., Homicide, section 210, page 299, in State v. Powell, 114 Mont. 571, 138 Pac. (2d) 949.

Because of the separate standard applied by the California statutes to deaths through the operation of vehicles, the decision in People v. Penny, supra, does not apply to vehicle cases; but since in our statute defining involuntary manslaughter there is no distinction between deaths caused by an automobile and deaths caused by any other instrumentality, it seems appar-

ent that the California Supreme Court has adopted the same viewpoint as this court with respect to the necessity of criminal negligence as an element of involuntary manslaughter.

Applying the foregoing discussion to the case at bar, we hold ▇▇▇▇ that Instruction No. 7, hereinbefore set forth at length, was erroneous in advising the jury that they might find the defendant guilty if she was driving on the wrong side of the road in violation of the statutes and if she thereby caused the death of Gerald Little. It is true that in Instruction No. 10 the lower court charged the jury "that evidence of ordinary negligence will not establish the criminal negligence which the state must prove beyond a reasonable doubt," and in Instruction No. 14 the jury was advised that in order "to find the defendant in this case guilty of criminal negligence, you must believe from the evidence beyond a reasonable doubt that the conduct of the defendant was such a departure from what would be the conduct of an ordinarily prudent or careful person under the same circumstances as to be incompatible with a proper regard for human life, or in other words, a disregard for human life or an indifference to consequences."

There was, however, no instruction advising the jury that ▇▇▇▇ °in every crime or public offense there must be a union or joint operation of act and intent or of act and criminal negligence. Since this instruction was not requested by the defendant, its absence is not reversible error, although as stated in State v. Allen, 34 Mont. 403, 87 Pac. 177, 183, this instruction "should always be given, especially when requested by the defendant."

In State v. Bosch, 125 Mont. 566, 574, 242 Pac. (2d) 477, 481, it is said:

"* * * under the familiar and well-established rule in this jurisdiction, in determining the effect of a given instruction all the instructions must be read and considered as a whole. Koppang v. Sevier, 106 Mont. 79, 92, 75 Pac. (2d) 790; State v. Darchuck, [Cited above.]"

However, the above rule was not made known to the jury

in the case at bar. The customary charge directing the jury to consider the instructions as a whole and not to single out any certain instruction and ignore the others, was not offered or given. The absence of this instruction might well have misled the jury to single out some one instruction, such as Instruction No. 7, and to decide the case upon it alone. Under these circumstances, the giving of Instruction No. 7 was especially prejudicial to the defendant.

Instruction No. 14 advised the jury of the character of the conduct necessary in order "to find the defendant in this case guilty of criminal negligence." This instruction as to finding the defendant guilty of criminal negligence might well have been confusing in the absence of any instruction that criminal negligence was an essential element of the crime of manslaughter with which the defendant was charged. It cannot be said in this case that the unobjectionable instructions cured Instruction No. 7 under the rules stated in State v. Darchuck and State v. Bosch, supra.

Because there was no substantial evidence that the defendant was driving under the influence of intoxicating liquor, and because of the error in giving Instruction No. 7, the defendant's motion for new trial should have been granted.

It may be parenthetically added that in the case of State v. Wojahn, supra [204 Or. 84, 282 Pac. (2d) 701], after a thorough review of the decisions upholding special statutes creating the offense of negligent homicide in the operation of a motor vehicle, the Oregon court observed that such statutes "were adopted after the manslaughter acts had proved ineffective as a means of repressing the negligence in motor vehicle operation which was causing deaths upon the public thoroughfares." The court in that case held that "the negligent homicide statute is a police regulation, and that the legislature did not intend that any form of moral culpability should be an element of the offense."

The decision herein does not change the holding of former decisions of this court that criminal negligence is an es-

sential component of manslaughter. Neither ordinary negligence[9] nor the violation of traffic regulations unaccompanied by criminal negligence will suffice to establish the essential element of *mens rea*. The crime of manslaughter has remained unchanged in definition since the enactment of section 355, Penal Code of 1895. The advent of the automobile with its ever increasing danger to human life and safety may, as indicated in the Wojahn case, necessitate the adoption of new legislation. But the crime of manslaughter, which may be committed by a multitude of means other than the operation of an automobile, may not be enlarged solely to accommodate it to the problem of the automobile as an instrument of death. The adoption of a negligent homicide statute relating only to death proximately caused by the driving of a motor vehicle is a matter of legislative policy.

For the reasons hereinabove stated, the judgment must be reversed and the cause remanded for a new trial. It is so ordered.

MR. JUSTICES ANGSTMAN and ANDERSON, concur.

MR. CHIEF JUSTICE ADAIR and MR. JUSTICE BOTTOMLY, dissent.